HEALTHPOINT, LTD., Plaintiff,

v.

ETHEX CORPORATION, Defendant.

Ethex Corporation, Counterclaim
Plaintiff,

v.

Healthpoint, Ltd., DPT Laboratories,
Ltd. and DFB Pharmaceuticals, Inc.
(f/k/a DFB Holding, Inc.), Counter-
claim Defendants.

Dpt Laboratories, Ltd. and Dfb Phar-
maceuticals, Inc., Counterclaim
Plaintiffs,

v.

Ethex Corporation and KV Phar-
maceuticals, Inc., Counter-
claim Defendants.

No. CIV.SA–00–CA–0757–OG.

United States District Court,
W.D. Texas,
San Antonio Division.

July 12, 2001.

Charles W. Hanor, Gunn, Lee & Hanor, P.C., San Antonio, TX, C. David Kinder, Saul H. Perloff, Kirt S. O'Neill, Akin, Gump, Strauss, Hauer & Feld, L.L.P., San Antonio, TX, Eric W. Cernyar, Attorney at Law, San Antonio, TX, for Plaintiff.

George H. Spencer, Jr., Clemens & Spencer, San Antonio, TX, Jeffrey J. Jowers, Charles A. Weiss, Daniel M. O'Keefe, St. Louis, MO, Clemens & Spencer, San Antonio, TX, Terrence J. O'Toole, St. Louis, MO, Peter R. Mathers, Kleinfeld, Kaplan & Beck, Washington, DC, for Defendant.

## ORDER

GARCIA, District Judge.

Pending before the Court are the Motions for Partial Summary Judgment filed by Healthpoint, Ltd. (Dkt.# 187, 188); the Report and Recommendation of the United States Magistrate Judge (Dkt.# 204) and Ethex Corporation's objections thereto (Dkt.# 217).

Where no party has objected to the Magistrate Judge's Memorandum and Recommendation, the Court need not conduct a de novo review. In such cases, the Court need only review the Memorandum and Recommendation and determine whether it is either clearly erroneous or contrary to law. *United States v. Wilson,* 864 F.2d 1219, 1221 (5th Cir.1989), *cert. denied,* 492 U.S. 918, 109 S.Ct. 3243, 106 L.Ed.2d 590 (1989).

On the other hand, if any party objects to the Memorandum and Recommendation, the Court must review those portions of the report de novo. *See* 28 U.S.C. § 636(b)(1) (a judge of the court shall make a de novo determination of those portions of the report or specified proposed findings and recommendations to which objection is made); *see also Kreimerman v. Casa Veerkamp, S.A. de C.V.*, 22 F.3d 634, 646 (5th Cir.1994), *cert. denied*, 513 U.S. 1016, 115 S.Ct. 577, 130 L.Ed.2d 492 (1994). Such a review means that the Court will examine the entire record and make an independent assessment of the law. The Court need not, however, conduct a de novo review when the objections are frivolous, conclusive, or general in nature. *Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir.1987).

In its objections, Ethex Corporation correctly notes some inconsistent statements in the Magistrate Judge's report. She recommends, without objection, that Healthpoint's Motion for Partial Summary Judgment on its claim of "palming off" should be *denied* (Dkt. # 204 @ p. 14). She further recommends, without objection, that Healthpoint's Motion for Partial Summary Judgment on Ethex Corporation's counterclaims of "misbranding" and distribution of industry letters also be *denied*. (Dkt. # 204 @ pp. 17–18). In conclusion, however, she states that Healthpoint's Motion for Partial Summary Judgment on Ethex's counterclaims should be *"granted in part and denied in part."* (Dkt. # 204 @ p. 18). This statement is contrary to the findings in the report, and it clearly appears that the recommendation is a *denial* of summary judgment on *all* claims.

Because Healthpoint has not objected to the recommendation, and the Court agrees with the findings therein, the recommendation should be accepted, with the exception of the misstatement contained in the conclusion, which the Court has rejected and clarified accordingly.

It is therefore ORDERED that the U.S. Magistrate Judge's report and recommendation (Dkt.# 204) is ACCEPTED in part and REJECTED in part as set forth above, and the Motions for Partial Summary Judgment filed by Healthpoint, Ltd. (Dkt.# 187, 188) are hereby DENIED in their entirety.

## *REPORT AND RECOMMENDATION*

MATHY, United States Magistrate Judge.

Pursuant to the Orders of referral in the above-styled and numbered cause of action to the undersigned United States Magistrate Judge[1] and consistent with the authority vested in United States Magistrate Judges under the provisions of 28 U.S.C. § 636(b)(1)(B) and rule 1(d) of the Local Rules for the Assignment of Duties to United States Magistrates, effective January 1, 1994, in the Western District of Texas, the following report addressing the referred motion for preliminary injunction is submitted for your review and consideration.

### I. *JURISDICTION*

The Court has jurisdiction pursuant to 28 U.S.C. § 1331, 1332, 1338, and 1367.

### II. *PROCEDURAL HISTORY*

By way of introduction, this lawsuit concerns two competing papain-urea wound

---

1. On November 30, 2000, Ethex's motion for preliminary injunction was referred (docket no. 24); on January 24, 2001, the case was referred to the undersigned for pretrial management, with the exception of newly filed motions for injunctive relief (docket no. 50); and on March 2, 2001, Healthpoint's cross-motion for preliminary injunction was referred (docket no. 100).

debridement ointments, Accuzyme made by Healthpoint Ltd. ("Healthpoint") and Ethezyme made by Ethex Corporation ("Ethex"). Both ointments are available by prescription only. Healthpoint introduced Accuzyme to the market in 1996 after reverse-engineering Panafil White, a papain-urea debridement ointment then marketed by Rystan. Thereafter, Healthpoint spent millions of dollars promoting Accuzyme, creating brand awareness and market acceptance. In 2000, Ethex introduced Ethezyme, a competing papain-urea wound debridement ointment, which Ethex created by reverse engineering Accuzyme. Ethex promoted Ethezyme as an "alternative" to Accuzyme. Advertising campaigns were launched for the allegiance of physicians, pharmacists, hospitals, long-term care facilities and formularies through technical advertisements in professional magazines designed to reach those consumers as well as marketing presentations by Healthpoint and letters sent by both Ethex and Healthpoint.

On August 3, 2000, Healthpoint filed this suit alleging, among other claims, that Ethex copied Accuzyme, a known trademark, by adopting a name "highly similar in sight and connotation" and sound causing confusion, falsely advertised Ethezyme as an alternative for Accuzyme, and "palmed off" Ethezyme as a Healthpoint product.[2] On the other hand, among other counterclaims, Ethex alleges that Healthpoint falsely advertised the ingredients of its Accuzyme product and that Healthpoint engaged in a false and disparaging advertising campaign regarding Ethezyme.[3]

The procedural history relevant to the motions addressed in this report is relatively complicated. This lawsuit began on or about August 3, 2000, when Healthpoint filed its original complaint against Ethex.[4] On October 11, 2000, Healthpoint filed a pre-answer first amended complaint.[5] On February 2, 2001, Healthpoint filed a second amended complaint, its "live" pleading in this case, which brings claims under the Lanham Act, 15 U.S.C. §§ 1051 *et seq.* for trademark infringement in violation of § 1114(1); false advertising in violation of § 1125, unfair competition in violation of § 1125(a)(1)(A); and dilution in violation of § 1125(c); and claims under the laws of Texas for trademark infringement, false advertising, unfair competition, dilution, defamation, business disparagement, misappropriation, and palming off.[6] Healthpoint requests damages, an accounting of profits, treble damages, punitive damages, attorney's fees, costs, pre-judgment interest, and permanent and preliminary injunctive relief on certain of its claims.

On October 27, 2000, Ethex filed a counterclaim against Healthpoint[7] and on February 2, 2001, filed an amended counterclaim adding DPT Laboratories, Ltd. ("DPT") and DFB Pharmaceuticals, Inc. ("DFB") as counterclaim defendants and pleading counterclaims for false advertising in violation of 15 U.S.C. § 1125(a) and for unfair competition, injurious falsehood, interference with prospective business relationships, and common law fraud in violation of Texas law.[8] Ethex requests compensatory damages, punitive damages,

---

**2.** Docket no. 10 at 13, 16, 24–25.

**3.** Docket no. 13 at 23 and 29.

**4.** Docket no. 1.

**5.** Docket no. 10.

**6.** Docket no. 73. On March 15, 2001, after the deadline for amending pleadings and add-

ing new parties, the Court denied Healthpoint leave to file a third amended complaint and first amended answer to Ethex's amended counterclaim. Docket no. 135.

**7.** Docket no. 13.

**8.** Docket no. 71. Healthpoint's second amended complaint and amended answer

attorney's fees, costs, pre-judgment interest, an accounting of profits, treble damages and injunctive relief on various of its claims.

On March 15, 2001, DPT and DFB filed their original answer to Ethex's counterclaim which included counterclaims against Ethex and an added party, KV Pharmaceuticals, Inc. ("KV"), the parent of Ethex, alleging trademark infringement in violation of 15 U.S.C. § 1114, common law trademark infringement, false advertising in violation of 15 U.S.C. § 1125, common law false advertising, unfair competition in violation of 15 U.S.C. § 1125, common law unfair competition, trademark dilution in violation of 15 U.S.C. § 1125(c), trademark dilution under Texas law, defamation under Texas law, business disparagement under Texas law, common law misappropriation under Texas law, common law palming off under Texas law, tortious interference, civil conspiracy, misappropriation of trade secrets and confidential information, breach of contract (the protective order), breach of confidential relationship, conversion, fraud, and violation of the Texas Theft Liability Act. DPT and DFB seek actual damages, an accounting of profits, treble damages, attorney's fees, costs expenses, pre-judgment interest and preliminary and permanent injunctive relief.

Ethex filed a motion for preliminary injunctive relief against Healthpoint on November 22, 2000.[9] On November 30, Ethex filed its memorandum in support of its motion for preliminary injunction.[10] On January 5, 2001, Healthpoint filed objections to Ethex's evidence in support of its motion for preliminary injunction.[11] On January 8, 2000, after several unopposed extensions of time, Healthpoint filed its response to the motion for preliminary injunction.[12] On January 17, 2001, Ethex's motion for preliminary injunction was set for a hearing on February 20, 2001.[13] On February 2, 2001, at the joint request of the parties and after Healthpoint had tendered its cross-motion for preliminary injunction, the Court postponed the hearing on Ethex's motion for preliminary injunction until March 22, 2001 and ordered that it be consolidated with the hearing on Healthpoint's cross-motion.[14]

Briefing on Ethex's motion for preliminary injunction was completed with the filing of the following documents: On February 2, 2001, Ethex filed objections to Healthpoint's evidence in response to Ethex's motion for preliminary injunction and its reply to its motion for preliminary injunction.[15] On February 16, 2001, Healthpoint filed its response to Ethex's

---

was filed on the same date as Ethex's amended counterclaim (docket nos. 71, 72 and 73).

9. Docket no. 20. This motion was filed only by Ethex and only against Healthpoint.

10. Docket no. 29.

11. Docket no. 38.

12. Docket no. 41.

13. Docket no. 44. On January 12, 2001, the parties filed a joint advisory stating that they could be ready for a hearing on or after April 2, 2001. Docket no. 43. When originally setting the hearing on Ethex's motion for pre-

liminary injunction to occur in February, the Order noted that Ethex's motion for preliminary injunction had been pending since November 22, 2000, that the proposed hearing date of April 2, 2001 was more than four months after that date, and that no party has asked for an extension of the jury trial date, June 25, 2001. The undersigned concluded that a February 2, 2001 hearing date would allow the parties some time for discovery prior to the hearing and allow some time for the undersigned to prepare a report and the District Court to consider it and objections prior to the June 25, 2001 jury trial date.

14. Docket no. 69.

15. Docket nos. 74 and 75.

objections to evidence.[16] On March 5, 2001, without objection from Ethex, Healthpoint filed its sur-reply to Ethex's motion for preliminary injunction.[17]

On February 20, 2001, Healthpoint's motion for preliminary injunction was filed.[18] On March 5, 2001, Ethex objected to certain of Healthpoint's evidence in support of its motion for preliminary injunction and on March 6, 2001, Ethex filed its response to Healthpoint's motion for preliminary injunction.[19] On February 28, 2001, Healthpoint's motion for preliminary injunction was set for a consolidated hearing with Ethex's motion for preliminary injunction to occur on March 22, 2001.[20] On March 14, 2001, the undersigned denied Ethex's opposed motion to postpone the hearing on the two motions for preliminary injunction.[21]

On March 9, 2001, Ethex filed a motion to dismiss all of Healthpoint's claims or to stay all of Healthpoint's claims pending the completion of an on-going FDA investigation into the misbranding of Accuzyme.[22] On March 29, 2001, Healthpoint filed its response and counter motion to partially dismiss Ethex's claims.[23] Ethex filed its response on April 17, 2001.[24]

Beginning March 22, 2001 and ending March 29, 2001, the Court held a consolidated evidentiary hearing on Ethex's motion for preliminary injunction and Healthpoint's cross motion for preliminary injunction. This report and recommendation addresses those two, specially referred motions. In addition, this report also addresses Ethex's related motion to dismiss or to stay and Healthpoint's counter-motion to partially dismiss, since the determination of whether any of the causes of action are within the primary jurisdiction of the FDA is a matter closely related to an assessment of likelihood of success on the merits.[25]

16. Docket no. 84.

17. Docket no. 109.

18. Docket nos. 88 and 89. This motion was filed only by Healthpoint and only against Ethex. On April 13, 2001, Healthpoint filed a supplemental brief to tender a recently decided case granting a preliminary injunction in favor of generic drug manufacturer (docket no. 194).

19. Docket nos. 107 and 111.

20. Docket no. 98.

21. Docket no. 133. Among other things, the Court noted the special referral of the two motions for preliminary injunction to the undersigned, the exigency implicit in a request for injunctive relief, Healthpoint's opposition to further postponing the hearing, the ability of Ethex to achieve its desired goal with respect to its motion (that it be consolidated with the trial on the merits) simply by making a decision to seek to withdraw its motion for preliminary injunction without prejudice to presenting all arguments in that motion at the trial on the merits and the fact that no party had asked for an extension in the trial.

22. Docket no. 122.

23. Docket no. 175.

24. Docket no. 198.

25. On January 5, 2001, the parties entered into a joint, agreed protective order that provided, in sum, that certain information which had been designated "confidential" or "attorney's eyes only" should be sealed (docket no. 36). The undersigned has previously indicated that "unless specific, advance justification is provided by a party, the Court continues to intend to enter unsealed Orders (and reports) in this case" (docket no. 118 at 13). No party has requested that the official record of the preliminary injunction hearing be sealed or that this report be sealed.

Several of the pleadings in connection to the cross motions for preliminary injunction have been sealed. Further, at the hearing, on one occasion an exhibit was identified as a document which Healthpoint has marked as "attorney's eyes only;" Healthpoint agreed it could be disclosed to others from Ethex who were then in court, apparently waiving any objection to further disclosure. On another

## III. *ISSUES*

1. Has Ethex satisfied its burden of proving entitlement to a preliminary injunction;

2. Has Healthpoint satisfied its burden of proving entitlement to a preliminary injunction;

3. Should Ethex's motion to dismiss or for stay pending the outcome of an FDA investigation be granted and/or should Healthpoint's counter-motion to partially dismiss Ethex's claims be granted.

## IV. *STANDARDS*

### A. *Preliminary Injunction Standards*

■ In this Circuit, the test for entitlement to a preliminary injunction has four parts. A preliminary injunction may be granted *only* if the moving party establishes each of the following four factors: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) that the threatened injury out-weighs any damage that the injunction may cause the opposing party; and (4) that the injunction will not disserve the public interest.[26] A preliminary injunction is an extraordinary remedy and the decision to grant a preliminary injunction is to be treated as the exception rather than the rule.[27]

■ An evidentiary hearing is not always required before a court rules on a preliminary injunction. If factual matters are not in dispute, no oral hearing is required and the parties need only be given "ample opportunity to present their views of the legal issues involved."[28] On the other hand, "when factual disputes are presented, the parties must be given a fair opportunity and a meaningful hearing to present their differing versions of those facts before a preliminary injunction may be granted."[29] The basic question on the need for a hearing is whether it will add anything material to the Court's consideration of the case.[30] Evidence at a hearing on a preliminary injunction need not be "testimonial" and affidavits can be considered by the Court.

The seven-day hearing concerning these two ointments, the six days of testimony, the parties' submission of declarations[31] or deposition excerpts in lieu of testimony,

occasion, the parties agreed to submit the deposition of Richard Chibnall in sealed fashion in lieu of public testimony at the hearing of Philip Vogt. Although this report refers to certain arguments and matters presented in sealed pleadings, the references are not believed to exceed what was substantially disclosed in the public record in connection with hearing.

26. *See e.g., Hoover v. Morales,* 146 F.3d 304, 307 (5th Cir.1998); *Wenner v. Texas Lottery Comm'n,* 123 F.3d 321, 325 (5th Cir.1997), cert. denied, 523 U.S. 1073, 118 S.Ct. 1514, 140 L.Ed.2d 667 (1998); *Cherokee Pump & Equip. Inc. v. Aurora Pump,* 38 F.3d 246, 249 (5th Cir.1994).

27. *Valley v. Rapides Parish Sch. Bd.,* 118 F.3d 1047, 1050 (5th Cir.1997).

28. *Kaepa v. Achilles,* 76 F.3d 624, 628 (5th Cir.), cert. denied, 519 U.S. 821, 117 S.Ct. 77, 136 L.Ed.2d 36 (1996). *See Miller Brewing Co. v. Ft. Worth Distrib. Co.,* 781 F.2d 494,

496 (5th Cir.1986); *Commerce Park at DFW Freeport v. Mardian Construction Co.,* 729 F.2d 334, 341 (5th Cir.1984). *See also Campbell Soup Co. v. Giles,* 47 F.3d 467, 470 (1st Cir.1995); *Stanley v. University of Southern Cal.,* 13 F.3d 1313, 1326 (9th Cir.1994) (no abuse of discretion to deny party right to call witnesses).

29. *Kaepa,* 76 F.3d at 628; *Commerce Park at DFW Freeport,* 729 F.2d at 341.

30. *Cf., Parker v. Ryan,* 959 F.2d 579, 584 (5th Cir.1992); *Worlds of Wonder, Inc. v. Veritel Learning Sys., Inc.,* 658 F.Supp. 351, 354 n. 2 (N.D.Tex.1986).

31. It was understood that if a declaration for a witness had been tendered attached to the preliminary injunction pleadings and then the witness tested live at the hearing, the declaration would not be additionally considered unless a party expressly stated otherwise or to the extent the declaration may have been used

and the parties' ability to object to or to counter-designate deposition excerpts provided the parties with sufficient opportunity to develop disputed facts relevant to the motions for preliminary injunction.[32] As a procedural note, any reference in this report to a portion of a declaration to which a party may have objected should be considered as a decision to overrule any noted objection.[33] Relatedly, and for the benefit of the District Court, it should be noted that the undersigned asked that if a deposition excerpt included a reference to any objection that was made at the time of the deposition and the objecting party was not willing to waive the objection for purposes of this preliminary injunction hearing only, that party was required to bring the specific non-waived objection to the attention of the undersigned. No advisory or in-court argument was made to identify any such objection. Finally, Healthpoint made and renewed an objection to Ethex's expert opinion testimony and, particularly, to the testimony of Dr. Schondelmeyer and Dr. Ross. Healthpoint argued its objection but requested no additional hearing and did not request that any testimony be stricken after it was received.[34] The Court has considered the objections, recognizes

its gate-keeping function under *Daubert* and *Kumho Tire*,[35] and has considered both the relevance of the evidence, including the fit to the issues in this case, and the reliability of the evidence. The Court finds by a preponderance of the evidence that, for the purposes of the cross-motions for preliminary injunction, the expert opinion testimony constitutes specialized knowledge that will assist the trier of fact, that the evidence is sufficiently reliable and that the witnesses are qualified to provide the evidence. The Court has considered Healthpoint's objections in assessing the weight to be given to the evidence.

## B. *Federal Rule of Civil Procedure 12(b)*

Under Fed.R.Civ.P. 12(b)(6) plaintiffs must state a claim upon which relief can be granted or the complaint may be dismissed with prejudice as a matter of law. A motion to dismiss under Rule 12(b)(6) "is viewed with disfavor and is rarely granted."[36] When considering a motion to dismiss for failure to state a claim, "all factual allegations in the complaint must be taken as true and construed favorably to the plaintiff."[37] The United States Supreme Court has elaborated:

at the hearing for cross-examination or impeachment.

**32.** *U.S. v. Premo*, 511 F.Supp. 958, (D.N.J., 1981) (11–day hearing conducted on 8 products involving the "generic/new drug issue").

**33.** During the course of the hearing, rulings were entered to overrule objections to noted portions of the declarations of Dr. Hobson and Mr. Anderson.

**34.** At the initiation of the hearing, the Court denied Healthpoint's motion to exclude certain of Ethex's proposed expert testimony for untimely designation, but did order that the parties be afforded the opportunity to depose each other's hearing experts, if that had not already been accomplished, prior to the time of their testimony.

**35.** *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

**36.** *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale*, 677 F.2d 1045, 1050 (5th Cir.), *cert. denied*, 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983), quoted in *Capital Parks, Inc. v. Southeastern Advertising & Sales Sys., Inc.*, 864 F.Supp. 14, 15 (W.D.Tex.1993), *aff'd*, 30 F.3d 627 (5th Cir.1994).

**37.** *Fernandez–Montes v. Allied Pilots Assoc.*, 987 F.2d 278 (5th Cir.1993). *See also Capital Parks, Inc.*, 30 F.3d at 629 ("A court's decision to dismiss for failure to state a claim may be upheld 'only if it appears that no relief could be granted under any set of facts that could be proven consistent with the allega-

Nothing in Rule 12(b)(6) confines its sweep to claims of law which are obviously insupportable. On the contrary, if as a matter of law "it is clear that no relief could be proved consistent with the allegations," *Hishon,* supra, 467 U.S. at 73, 104 S.Ct. at 2232, a claim must be dismissed, without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one.[38]

## V. ANALYSIS: FINDINGS OF FACT; CONCLUSIONS OF LAW

### A. Summary of the Allegations

Ethex's motion for preliminary injunction is based on its false advertising claim and alleges that Healthpoint and its sales representatives have provided false and misleading information that:

(1) Ethezyme cannot be a " 'generic' or 'alternative' to Accuzyme under federal law because [Ethezyme has] not been approved by the Federal Food and Drug Administration ('FDA') as 'therapeutically equivalent;' "[39]

(2) "Ethezyme is unsafe and 'potentially life threatening' because it contains sodium metabisulfite;"[40]

(3) "pharmacists may be held liable for substituting Ethezyme for Accuzyme;"[41]

(4) "severe reactions have occurred among several patients using Ethezyme;"[42]

(5) "debridement of wounds with Ethezyme is not as good as with Accuzyme;"[43]

(6) "Ethex puts out inferior drugs;"[44]

(7) "Ethezyme is worthless;"[45]

(8) "the papain in Ethezyme is an insufficient quantity;"[46]

(9) "it is necessary to store Ethezyme at a cooler temperature than is required for Accuzyme;"[47]

(10) "Ethezyme is not rated implying . . . that there is some requirement for Ethezyme to be AB rated, while failing to state that Accuzyme is not approved by the FDA as a new drug;"[48] and

(11) "a patient in the St. Louis area suffered anaphylactic shock."[49]

In addition, Ethex alleges that "Accuzyme's label is false, misleading and deceptive because it claims that Accuzyme has $1.1 \times 10^6$ USP units of papain activity when in fact it has substantially less."[50] Ethex further alleges that such labeling is misbranding in violation of the Food, Drug and Cosmetic Act ("FFDCA" or "FDCA").[51] With regard to the alleged

tions.' *Baton Rouge Bldg. & Constr. Trades Council AFL–CIO v. Jacobs Constructors, Inc.,* 804 F.2d 879, 881 (5th Cir.1986).") *See also O'Quinn v. Manuel,* 773 F.2d 605, 608 (5th Cir.1985).

38. *Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

39. Docket no. 29 at 4–5.

40. *Id.* at 9.

41. *Id.* at 12.

42. *Id.* at 13.

43. Docket no. 29 at 13.

44. *Id.*

45. *Id.*

46. *Id.*

47. *Id.*

48. *Id.* at 13–14.

49. *Id.* at 14.

50. *Id.* at 18. 21 U.S.C. §§ 301–95. *See,* particularly, § 352, with reference to misbranding.

51. *Id.*

false representations and misbranding, Ethex requests the Court to order Healthpoint to: correct the false and misleading information Healthpoint has provided about Accuzyme, Ethezyme, and Ethex;[52] recall all packages of Accuzyme containing "less than 90 percent (%) of the papain activity claimed on its label;" and inform all past and future purchasers of Accuzyme that the product "has not been produced in accordance with current good manufacturing practices and that the level of papain activity in Accuzyme is likely to be" less than stated on the label.[53]

Healthpoint's cross-motion for preliminary injunction is based on its false advertising and "palming off" claims and alleges that Ethex has made false and misleading statements that:

(1) Ethezyme is a "generic form of, the same as, a substitute for, and alternative to, a therapeutic equivalent to or substitute for Accuzyme ointment;"[54]

(2) "Ethezyme ointment is 'the new standard of potency in papain/urea debriding ointments'" suggesting FDA approval as well as recognition for safety and efficacy;[55]

(3) "Ethezyme ointment has 'full potency,' i.e. more papain activity per gram than Accuzyme;"[56]

(4) "'the labeled potency claim for Healthpoint's Accuzyme product is being revised downward by 25%;'"[57]

(5) "Accuzyme has 'potency problems;'"[58]

(6) "Ethezyme ointment is 'AB-rated'" implying that "Ethex has submitted, and that the FDA has approved an abbreviated new drug application ('ANDA');"[59]

(7) Ethezyme is a "scientifically advanced alternative" or a "high quality . . . alternative;"[60]

(8) "Ethezyme ointment works 'better and faster;'"[61]

(9) "Healthpoint is obligated to change its trade name and National Drug Code ('NDC') number;"[62] and

(10) "Healthpoint had endorsed Ethezyme as working faster and better than the Accuzyme product."[63]

Healthpoint requests the Court to order Ethex to cease inducing consumers to substitute Ethezyme for Accuzyme and to order that future Ethezyme product packag-

---

**52.** Ethex requests that the Court enjoin Healthpoint during the pendency of this lawsuit from providing the following false and misleading information (a) "Ethezyme is not an alternative to Accuzyme;" (b) "Ethezyme is ineffective or inferior to Accuzyme;"(c) it violates "federal or state law to prescribe, dispense, administer, or use Ethezyme in place of Accuzyme;" (d) "Ethezyme is not an alternative to Accuzyme because it contains sodium metabisulfite;" (e) "Accuzyme has been approved by the Food and Drug Administration ('FDA');" (f) "Ethezyme requires FDA approval or rating" or is "inferior to Accuzyme because it lacks an FDA approval or rating;" (g) "Ethex puts out inferior drugs;" and (h) "Ethezyme is dangerous or unsafe and should not be used because of possible adverse reactions." Docket no. 20.

**53.** *Id.* at 2–3.

**54.** Docket no. 89 at 9.

**55.** *Id.* at 9, 24.

**56.** *Id.*

**57.** *Id.*

**58.** *Id.*

**59.** *Id.* at 10.

**60.** *Id.* at 11.

**61.** *Id.*

**62.** Docket no.89 at 23.

**63.** *Id.*

ing contain a notice that Ethezyme is not to be substituted for Accuzyme.[64]

Ethex's motion to dismiss or for stay pending the outcome of an FDA investigation argues that "Healthpoint possesses unclean hands requiring dismissal of all claims or the claims against Ethex should be stayed pending an ongoing FDA investigation into the misbranding of Healthpoint's Accuzyme product." [65] Ethex notes that Healthpoint seeks injunctive relief on each of its causes of action and argues that the defense of "unclean hands" is available in actions for false advertising, unfair competition, trademark infringement and dilution when equitable relief is sought. Ethex alleges that Healthpoint "misbranded" Accuzyme, representing on its label that it contained papain at a given level but admitting that the actual potency of papain was at a different level, overstating the papain level to consumers and duping would-be competitors into replicating the labeled strength of papain.[66] Ethex argues that this conduct related to the misbranding, which requires no FDA interpretation, is inequitable conduct relating to Accuzyme which precludes Healthpoint from receiving equitable relief. Alternatively, Ethex argues that if the Court should agree with Healthpoint that a determination of the falsity of the Accuzyme labels rests in the hands of the FDA, then, under the doctrine of primary jurisdiction, the entire case should be suspended pending action by the FDA.[67] Finally, Ethex argues that if it is true, as Healthpoint argues, that the FDA has primary jurisdiction over alleged misrepresentations by Accuzyme's label, then the FDA should also have primary jurisdiction over Healthpoint's allegations that Ethex falsely represented that Ethezyme was a generic equivalent to, alternative for, and could be substituted for Accuzyme. If so, plaintiff cannot demonstrate a *prima facie* case of federal or common law false advertising without the Court "usurp[ing] the FDA's responsibility of interpreting the FDCA and its own regulations." [68]

Healthpoint's response and cross-motion to dismiss argues, in sum, that Ethex's mislabeling claims should be dismissed because, among other reasons, Ethex's claim and unclean hands defense requires the court to interpret FDA regulations and Ethex has failed to show a causal connection between the alleged mislabeling and its own sales position to show a Lanham Act violation. Healthpoint also argues that Ethex has failed to state a cause of action on its claim that Healthpoint's studies do not meet the FDA's requirement for proof of safety and efficacy since the Court should consider and apply, not FDA standards, but whether there is some support for its position to defeat a Lanham Act claim. Healthpoint also argues that its

---

**64.** *Id.* Healthpoint asks the Court to enjoin Ethex during the pendency of this litigation: (1) from making allegedly false and misleading comparative representations that suggest Ethezyme "is superior to or an equivalent or alternative to or can be substituted or interchanged with" Accuzyme; (2) to disseminate corrective advertising that: (a) "Ethex has not tested Ethezyme on humans;" (b) "Ethezyme ointment is not AB-rated;" (c) Ethezyme "has not been proven to be therapeutically equivalent to Accuzyme;" (d) "there are known differences between" Accuzyme and Ethezyme; (e) Ethezyme "does not contain the same active ingredients in the same quan-

tities as Accuzyme;" (f) "Ethezyme ointment contains sodium metabisulfite;" (g) Ethezyme's "higher amounts of papain do not work better and faster;" (h) Accuzyme "does not have potency problems;" and (i) Ethezyme "is not the new standard in potency in papain/urea debriding agents." *Id.* at 31.

**65.** Docket no. 122 at 1.

**66.** Docket no. 122 at 3–4.

**67.** Docket no. 122 at 8–9.

**68.** Docket no. 122 at 15 and 9–16.

statements to consumers about the law applying to generic drugs were based on FDA regulations, advertising guidance and warning letters and may not form the basis of a Lanham Act claim. Healthpoint argues that the Court need not defer to the FDA in resolving Healthpoint's unfair competition claims because it is the responsibility of the FDA to insure that drugs are safe, effective and not misbranded but it is the Court's responsibility to protect firms from unfair competition. Finally, Healthpoint argues that Ethex's unclean hands defense should be dismissed with prejudice because if the Court declines to consider Healthpoint's Lanham Act claims based on alleged mislabeling the Court will be giving Ethex a temporary license to "swindle and defame" Healthpoint by claiming and implying Ethezyme may be substituted for Accuzyme. Healthpoint asks that Ethex's mislabeling and unclean hands be dismissed because they require interpretation of FDA regulations to succeed.

## B. *Dismissal or Stay of Healthpoint's Claims Pending FDA Investigation*

As a threshold matter, the Court addresses Ethex's argument that all of Healthpoint's claims should be dismissed or stayed and Healthpoint's counter-argument that Ethex's mislabeling and unclean hands claims should be dismissed because they require direct interpretation of FDA rules and regulations. Aspects of these arguments are relevant to an assessment of preliminary injunction burdens such as likelihood of success on the merits and irreparable harm, but a separate discussion of the primacy of FDA jurisdiction is undertaken here in light of the separately filed motion to dismiss.

In brief, Ethex argues that the FDA is conducting an investigation both of the alleged misbranding of Accuzyme and of Ethex's alleged misrepresentations in the marketing of Ethezyme.[69] Ethex also argues that the doctrine of "unclean hands" prevents Healthpoint from receiving injunctive relief and requires the dismissal of all of Healthpoint's claims due to admitted mislabeling. Alternatively, Ethex argues that Healthpoint's claims of false advertising under the Lanham Act and common law should be dismissed because Healthpoint's *prima facie* case is dependent upon determinations that the FDA should make. Alternatively, Ethex argues that Healthpoint's allegations that Ethex improperly markets Ethezyme as a generic to and equivalent of Accuzyme should be stayed pending completion of an FDA investigation. Finally, Ethex argues that all of Healthpoint's claims should be dismissed because Healthpoint has not demonstrated that Accuzyme is being marketed lawfully.[70]

In response and in sum, Healthpoint argues that the motion to dismiss or stay should be denied because Healthpoint's false advertising claims do not require the interpretation of FDA regulations. Healthpoint moves for the dismissal of Ethex's unclean hands and mislabeling claims because they do require the interpretation of FDA regulation.

This is not the first time in which a federal court has been asked to determine whether a Lanham Act or related common law claim may proceed or whether such a claim is merely an impermissible vehicle for the assertion of a violation of the FDCA. Section 337(a) of the FDCA provides that "all such proceedings for the enforcement, or to restrain violations of [the Act] shall be in the name of the United States." Construing this language and considering related arguments, courts

---

**69.** Docket no. 122; docket no. 121 at 2–3, 14, 15–16 and exhibits J and K.

**70.** Docket no. 198 at 16–19.

have held that the FDCA does not create a private right of action to enforce or restrain the provisions of the FDCA or FDA regulations.[71]

Analogously, other courts have held that a party should not be allowed to use the Lanham Act or a related common law cause of action to assert, in effect, a violation of the FDCA. Although the parties have not cited any Fifth Circuit precedent on point, other courts have held that allegations of false and misleading advertising that "stray[ ] too close to the exclusive enforcement domain of the FDA"[72] are impermissible attempts to circumvent section 337(a)'s denial of a private right of action. A brief discussion of a few of the cases addressing this issue is instructive as to the general framework for drawing the boundary between the FDCA and FDA enforcement domain, on the one hand, and permissible Lanham Act and related common law claims, on the other.

In *Sandoz Pharmaceuticals Corp. v. Richardson–Vicks, Inc.*, plaintiff brought a Lanham Act claim, alleging that defendant falsely listed an ingredient as "inactive" on a cough syrup label when the FDA required that the ingredient be labeled as "active".[73] Defendant argued that plaintiff's claim was a misbranding violation of the FDCA for which there was no private right of action. The Third Circuit affirmed the district court's denial of a preliminary injunction, agreeing with the district court that plaintiff had not demonstrated likelihood of success on the merits; because the FDA had *not* found conclusively that the ingredient should be labeled as "active" under FDA regulations, plaintiff had not shown that the labeling was false. The Third Circuit stated:

> [plaintiff's] position would require us to usurp administrative agencies' responsibility for interpreting and enforcing potentially ambiguous regulations. Jurisdiction for the regulation of OTC drug marketing is vested jointly and exhaustively in the FDA and the FTC, and is divided between them by agreement. Neither of these agencies' constituent statutes creates an express or implied private right of action and what the [FDCA] and the FTC Act do not create directly, the Lanham Act does not create indirectly, at least not in cases requiring original interpretation of these Acts or their accompanying regulations.[74]

The Court held that "[b]ecause agency decisions are frequently of a discretionary nature or frequently require expertise," the court would not preempt the exercise of that discretion by directly applying FDA regulations through the Lanham Act to address what was, in effect, a misbranding claim, governed by FDA regulations, concerning a subject matter that the FDA had not yet resolved.[75]

---

**71.** In addition to the cases summarized below, *see e.g.*, *PDK Labs., Inc. v. Friedlander*, 103 F.3d 1105 (2d Cir.1997); *Gile v. Optical Radiation Corp.*, 22 F.3d 540, 544 (3rd Cir.), cert. denied, 513 U.S. 965, 115 S.Ct. 429, 130 L.Ed.2d 342 (1994); *Bailey v. Johnson*, 48 F.3d 965, 967 (6th Cir.1995); *Pacific Trading Co. v. Wilson & Co.*, 547 F.2d 367, 370 (7th Cir.1976). Cf., *Merrell Dow Pharms., Inc. v. Thompson*, 478 U.S. 804, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986) (Supreme Court assumed that there was no private cause of action for FDCA violations, as parties had agreed and lower court had found).

**72.** *Summit Technology, Inc. v. High–Line Med. Instruments Co., Inc.*, 922 F.Supp. 299, 306 (C.D.Cal.1996) and 933 F.Supp. 918, 933 (C.D.Ca.1996).

**73.** 902 F.2d 222, 230 (3rd Cir.1990).

**74.** 902 F.2d at 231.

**75.** *Id.*

In *Mylan Laboratories, Inc. v. Matkari,* the Fourth Circuit reversed the dismissal of plaintiff's Lanham Act claim under Rule 12(b)(6) that defendants had falsely represented that their product was the "bioequivalent" of plaintiff's product [76] and upheld the dismissal of plaintiff's claim that defendants had falsely represented that their drugs had been approved by the FDA merely by the act of offering them in the market.[77] In regard to the false representations, the district court had dismissed Mylan's Lanham Act claims on the ground that the complaint failed to alleged specifically that Matkari's drugs were not bioequivalent. The Fourth Circuit held that the district court "correctly noted that, in order *ultimately* to succeed on its Lanham Act count, Mylan will have to show more evidence than mere proof that defendants' claims were supported by unpersuasive test results." But, the Fourth Circuit reversed this dismissal, holding that Mylan's allegations that defendant had falsely represented that its product was "bioequivalent" to Mylans's counterpart and "other approved generic equivalents," was entitled to an "AB" rating from the FDA, and that the product was the "generic alternative" to Mylan's product were "sufficiently particularized allegations of false or misleading representations to sustain for now" the Lanham Act claims.[78]

But, the Fourth Circuit upheld the dismissal of Mylan's claim that the defendant had falsely represented its drug was approved by the FDA by placing the drug on the market because such a claim, without evidence of any advertising by defendant, was an impermissible attempt to enforce the FDCA and FDA regulations. The Fourth Circuit stated:

> We agree with defendants that permitting Mylan to proceed on the theory that the defendants violate § 43(a) [§ 1125(a) of the Lanham Act] merely by placing their drugs on the market would, in effect, permit Mylan to use the Lanham Act as a vehicle by which to enforce the [FDCA] and the regulations promulgated thereunder. An attempt, by ingenious pleading, to escape one principle of law by making it appear that another not truly appropriate rule is applicable appears to have been attempted. Mylan in short, is not empowered to enforce independently the FDCA. In order to state a proper claim for relief under .. the Lanham Act, Mylan was required to point out *some* claim or representation that is reasonably clear from the fact of the defendants' advertising or package inserts. That it did not do.[79]

In *Eli Lilly & Co. v. Roussel Corp.,* Eli Lilly brought suit against competitors sell-

---

**76.** *Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1138 (4th Cir.1993), *cert. denied,* 510 U.S. 1197, 114 S.Ct. 1307, 127 L.Ed.2d 658 (1994). The district court dismissed the Lanham Act claims because Mylan "failed to allege specifically that the defendant's drugs were not in fact bioequivalent." *Id.* at 1138. In reversing, the Fourth Circuit noted that to prove a Lanham Act claim based on an allegation that the defendant had falsely represented its drugs were bioequivalent to Mylan's products, Mylan would have to establish that the defendant's claims were supported by tests "not sufficiently reliable to permit one to conclude with reasonable certainty that they established" defendant's claims. *Id.* (citations omitted). The Fourth Circuit found that Mylan's claims of false representations of bioequivalence were sufficiently supported by allegations that defendant's ANDAs were obtained by fraud, that bioequivalence studies had been falsified or were seriously unreliable, and that bioequivalence studies were performed on a drug manufactured differently from the one advertised and should not have been dismissed. *Id.* at 1138.

**77.** 7 F.3d at 1139.

**78.** *Id.* at 1138.

**79.** *Id.* (emphasis in original) (citing *Sandoz Pharmaceuticals Corp.,* 902 F.2d at 230).

ing bulk cefaclor, an antibiotic, and against other drug companies that purchased the cefaclor for resale in retail dosage units.[80] For many years, Lilly was the only manufacturer of cefaclor but after Lilly's patent expired, a competitor sought FDA approval to sell bulk cefaclor. The FDA approved the abbreviated drug application required in that instance (and "AADA"). Later, the FDA informed the competitor that it had found that its AADA contained false and misleading information. Eli Lilly brought suit, alleging a Lanham Act claim, among others, alleging that the manufacturer obtained FDA approval by making false statements to the FDA and that defendants misleadingly used terms such as "generic," "cefaclor," or "alternative to brand-name drugs" in product inserts and marketing materials implying that their retail dose of cefaclor was safe and effective.[81] The Court dismissed Eli Lilly's Lanham Act claim for failure to state a claim, noting that failure to disclose facts is not actionable under the Lanham Act;[82] that if mere marketing a drug is an implied representation that the drug has

been approved by the FDA, such a claim is an FDCA violation to be decided by the FDA;[83] and that whether use of the terms "generic," "cefaclor," "alternatives to brand-name drugs," and "safe and effective" implied FDA approval similarly "rely on interpretations of the FDCA" and were not alleged to be affirmative misrepresentations standing on their own.[84] The Court emphasized that "Lilly has not alleged that defendants made false representations as to the quality, bioequivalency or safety of its products. Lilly has not alleged that defendants' cefaclor was not generic cefaclor, or that it was not bioequivalent to Ceclor or that it was not safe and effective."[85] The Court held that, as in *Mylan,* such "broad and conclusory allegations" do "not allege that defendants misrepresented the quality of their products, but are based on defendants' misrepresentations that they properly obtained FDA approval."[86] Absent an express, false statement that the FDA had approved the drug or other false statements about the product, false implications of approval are not actionable.[87]

**80.** 23 F.Supp.2d 460 (D.N.J.1998).

**81.** 23 F.Supp.2d at 470.

**82.** *Id.* at 475.

**83.** *Id.* at 477.

**84.** *Id.* at 476, 479. Significantly, the Court declined to address the claim that by affirmatively stating in ads that the FDA had approved the AADA for generic cefaclor, defendants had false conveyed to the public it had legitimately obtained FDA approval. *Id.* at 475 n. 25.

**85.** *Id.* at 479.

**86.** *Id.*

**87.** *Eli Lilly & Co.,* relied on *Barr Labs., Inc. v. Quantum Pharmics, Inc.,* 827 F.Supp. 111 (E.D.N.Y.1993), in which the court held a drug manufacturer inadequately pleaded its false advertising claim under the Lanham Act.

As in *Eli Lilly & Co,* the FDA had found untrue statements and omissions concerning the production and testing of lots used to support approval of the applications which raised questions as to the reliability of the data submitted by Quantum. *Id.* at 118. However, the Court also recognized that neither the FDA, nor Barr, had found that Quantum's drugs were not bioequivalent to the innovator drug as represented by Quantum. Finding that the complaint contained "broad and conclusory allegations" that Quantum falsely represented the therapeutic value of its generic drugs but did "not specify what falsehoods or misrepresentations, if any, were contained" in the promotional information, or "any facts demonstrating that Quantum included false bioequivalence data in the ANDA's that were submitted to the FDA," or that "the drugs were not the bioequivalent of the respective innovator drugs," the district court dismissed the Lanham Act false advertising claims without prejudice to re-pleading. 827 F.Supp. at 118.

In *Grove Fresh Distributors, Inc. v. Flavor Fresh Foods, Inc.*, (*"Grove Fresh I"*), plaintiff alleged that because defendant's orange juice contained additives and adulterants, the representation that the product was "100 % orange juice from concentrate" was false.[88] The district court denied defendants' motion to dismiss plaintiff's Lanham Act claim, holding that it was not an impermissible attempt to recover damages for the misbranding of food in violation of the FDCA:

> Grove Fresh relies on the FDA regulation [that defines "orange juice from concentrate"] merely to establish the standard or duty which defendants allegedly failed to meet. Nothing prohibits Grove Fresh from using the FDCA or its accompanying regulations in that fashion.... Grove Fresh does not base its claim solely on the FDCA or FDA regulations. Grove Fresh alleges that defendants have violated section 43(a) of the Lanham Act. Even without the FDA regulation defining "orange juice from concentrate," Grove Fresh could attempt to establish a violation of section 43(a). Grove Fresh would simply need to provide other evidence establishing the proper market definition of "orange juice from concentrate." [89]

The court allowed plaintiff to bring a Lanham Act cause of action for affirmatively misrepresenting facts -whether the orange juice was "pure" under a commercial definition—without interpreting any FDA regulation.

Two months later, the same Court (before a different judge) in *Grove Fresh Distributors, Inc. v. Everfresh Juice Co.*, (*"Grove Fresh II"*), held that "[w]here Congress has precluded private causes of action under the FDCA, we find it difficult to justify the use of the FDCA to establish a crucial element of a private cause of action under the Lanham Act." [90] To sustain a Lanham Act claim the court held that Grove Fresh would have to "provide other evidence establishing the proper market definition of 'orange juice from concentrate.' " [91]

In *Summit Technology, Inc. v. High-Line Medical Instruments Co.*, (*"Summit I"*) the district court dismissed plaintiff's Lanham Act and common law unfair competition claims that defendants had failed to disclose that their ophthalmological laser systems had *not* been approved by the FDA.[92] The Court held that because the FDA had not yet determined that defendants' systems needed approval, allowing plaintiff's Lanham Act claim to proceed would force the Court to decide the legality of defendants' conduct before the FDA had a chance to do so.[93] After plaintiff amended its complaint, the court, in *Summit II*, reiterated that "absent an affirmative representation that a drug has been officially approved by the FDA, a Lanham Act claim alleging that the defendant had failed to disclose FDA non-approval could not stand." [94] The Court explained that an

> affirmative misrepresentation that a product has "FDA approval" ... is actionable because it clearly misstates a fact and does not require an interpretation or application of FDA regulations.... [A] court can test the truth of the statement "FDA approval" without any need to interpret FDA regulations.[95]

On the other hand, the Court held that "to test the truth of defendant's apparent

---

**88.** 720 F.Supp. 714, 716 (N.D.Ill.1989).

**89.** 720 F.Supp. at 716.

**90.** 1989 WL 152670 (N.D.Ill. Nov.29, 1989).

**91.** *Id.* at * 3.

**92.** 922 F.Supp. at 307, 316.

**93.** *Id.*

**94.** 933 F.Supp. at 933.

**95.** 933 F.Supp. at 933 n. 7.

claim that it can legally import the Summit lasers, the Court would be required to perform an 'original interpretation' of the FDA regulations governing this area," an exercise the Court was not willing to undertake.[96]

In *Braintree Laboratories, Inc. v. Nephro-Tech, Inc.,* a district court held that allegations the defendant falsely described and misbranded its product as a "dietary supplement" in violation of § 1125(a) and common law unfair competition should be dismissed because it is for the FDA and not the court to decide whether defendant's product is properly classified as a "dietary supplement" under the FDCA and FDA regulations.[97] This court was unwilling to consider evidence establishing an independent lay understanding of the term "dietary supplement" even though Braintree alleged that Nephro-Tech's labeling of its unapproved product as a "dietary supplement" was false "in the ordinary sense because the calcium in the product is not intended to be absorbed." [98]

In sum, courts have held not only that a plaintiff may not seek to enforce directly the FDCA through the Lanham Act but also that a plaintiff may not maintain a Lanham Act claim if the claim requires direct application or interpretation of the FDCA or FDA regulations. "[S]uch a claim would allow a private litigant to interfere with the FDA's own investigatory time-table and prosecutorial decision-making ... [and] ... would force the Court to rule directly 'on the legality of ... conduct before the FDA has had a chance to do so.' " [99] The District Court should not "determine presumptively how a federal agency will interpret and enforce its own regulations." [100] To do so would violate Congressional intent that the FDA have discretion to enforce the FDCA and implementing regulations.[101] But, as in *Mylan, Grove Fresh I,* and *Summit,* some courts have held that certain false statements are actionable under the Lanham Act "even if their truth may be generally within the purview of the FDA." [102] There is no single, bright-line test to distinguish sustainable from non-sustainable claims.

■ In this case, as summarized above, Healthpoint's motion for preliminary injunction, based on its claims of false advertising and "palming off," addresses Ethex's allegedly false representations that Ethezyme, in sum, "is superior to or an equivalent or alternative to or can be substituted or interchanged with" Accuzyme.[103]

---

96. 933 F.Supp. at 934 ("this the Court cannot do").

97. 1997 WL 94237 *7 (D.Kan. Feb.26, 1997) ("it is not for this court to interpret and apply the statutory definition of 'dietary supplement.' ... even if it were to be determined in litigation that Calphron did not meet some independent, lay understanding of the term 'dietary supplement,' defendants might not be able to remove the term from its label without violating the FDCA and risking suit by the FDA. The possibility of such a dilemma demands that classic misbranding claims, such as the one here at issue, be reserved solely for resolution by the FDA."). Although unreported decisions have no precedential value, given the similarity in the issues, the reasoning of *Braintree Labs., Inc.,* as in *Grove Fresh II* first discussed above, are persuasive.

98. *Id.* at *7.

99. 933 F.Supp. at 932 (quoting *Summit I,* 922 F.Supp. at 306).

100. *Id.* (quoting *Sandoz,* 902 F.2d at 223) (citations omitted). *See Dial A Car, Inc. v. Transp., Inc.,* 82 F.3d 484, 490 (D.C.Cir.1996) (Lanham Act cannot be used as "back-door method" of interpreting and enforcing administrative regulations).

101. *U.S. v. Goodman,* 486 F.2d 847, 855 (7th Cir.1973).

102. 933 F.Supp. at 933.

103. Docket no. 89 at 13, 16, 23 and 33. Healthpoint asks that Ethex be enjoined from making false comparative representations be-

Ethex's motion for preliminary injunction, based on its false advertising claim, addresses Healthpoint's allegedly false representations that, in sum, Ethezyme is not an alternative to, is not as effective as, or is inferior to Accuzyme or is unsafe; or that Ethezyme requires federal approval.[104] The question for the District Court is whether the adjudication of these claims, or aspects of the these claims, require the direct application of the FDCA or rely on the FDCA or FDA regulations or policy to establish a critical element of a claim or defense.

The FDA has primary jurisdiction to decide Ethex's claim that Healthpoint has misbranded its product due to allegedly incorrect labeling information regarding the papain activity of Accuzyme. Ethex describes the allegedly false information on Accuzyme's label as constituting "the offense of misbranding" and appears to concede in an alternative argument in its motion to dismiss that such matters could be considered to be within the primary jurisdiction of the FDA.[105] Ethex also has argued that the claim that Healthpoint has falsely advertised Accuzyme because its label does not match the ingredients in the actual product can be severed from the misbranding claim and can be considered as false advertising under the Lanham Act.[106] But, such a claim involves all the facts and arguments to be determined in a misbranding enforcement action, matters within the sole jurisdiction of the FDA. As in *Grove Fresh II*, a party may not use the FDCA to establish a crucial element of a Lanham Act claim. To the extent that a Lanham Act claim can be fashioned—by considering the Accuzyme label as an "advertisement" and representation of its ingredients[107]—as reflected below, Ethex has not established a likelihood of succeeding on the merits of showing that there is a causal connection between the alleged mislabeling and any loss of sales or good will, a necessary element of a Lanham Act false advertising claim.[108] Ethex has not produced any evidence that shows anyone prescribed or dispensed Accuzyme based on its label claim of papain or that Ethezyme—apparently exclusively marketed as an alternative to Accuzyme—was deprived

tween the two products and be required to disseminate corrective advertising covering nine specific areas, outlined above, presumably related to Ethex's allegedly false statements and palming off. *See especially* docket no. 89 at 33–34.

104. That is, Healthpoint's allegedly false representations that: federal law requires a finding of therapeutic equivalence by the FDA and FDA approval before a drug may be considered to be an "alternative;" pharmacists may be liable for substituting Ethezyme for Accuzyme; and Ethezyme requires FDA approval. Ethex asks that Healthpoint be enjoined from making certain statements about Ethezyme, including that Ethezyme is not an "alternative" to Accuzyme and that Healthpoint be required to disseminate corrective advertising. *See especially* docket no. 29 at 4, 9, 12 and 17.

105. Docket no. 122 at 8–9.

106. Ethex concedes that there is no private right of action under the FDCA for misbranding, but has argued that irrespective of how the FDA interprets its regulations and the propriety of Accuzyme's label, it should be able to proceed on its claim that Accuzyme's label does not accurately describe the product and that consumers have been mislead. Docket no. 129 at 2–3. To this extent, Ethex appears to have modified its request that all false labeling claims be stayed. *See* docket no. 198 at 7–8.

107. 21 U.S.C. § 321(m); *Kordel v. U.S.*, 335 U.S. 345, 350, 69 S.Ct. 106, 93 L.Ed. 52 (1948); *V.E. Irons, Inc. v. U.S.*, 244 F.2d 34, 39 (1st Cir.1957).

108. 15 U.S.C. § 1125 permits a claim to be brought by a person "who believes he or she is likely to be damaged." *See* docket no. 71 (Ethex's amended counterclaim) at 6, 18–19; and summary of factual findings and conclusions below.

of a single substitution based on Accuzyme's label claim of papain.

Similarly, arguments concerning what federal law does or does not require for Ethyzyme and Accuzyme to be marketed legally [109] require the direct application and interpretation of FDA regulations.[110] Accuzyme has presented several arguments to show it is legally marketed.[111]

**109.** The FDCA, first enacted in 1938 and subsequently amended, instituted pre-market clearance for new drugs before a drug may be sold in interstate commerce. 21 U.S.C. § 355(a). The FDCA defines "drug" broadly to include any article listed in the USP and any article intended to affect the structure or function of the human body. 21 U.S.C. § 321(g)(1). The FDCA's pre-market clearance through an NDA is required for every drug unless it satisfies one of two exceptions to the statutory definition of "new drug." A drug is a "new drug" *unless* it has been "generally recognized, among [qualified] experts ... as safe and effective for the use under the conditions, prescribed, recommended, or suggested in the labeling thereof" ("GRAS/E") based on testing and investigations and use outside of the investigatory process. 21 U.S.C. § 321(p)(1) and (2). Alternatively, a drug is a "new drug" *unless* the drug was on the market before the FDCA came into effect in 1938 and "was subject to the Food and Drugs Act of June 30, 1906 ... [and] ... its labeling contained the same representations concerning the conditions of its use." *Id. See Weinberger v. Hynson, Westcott & Dunning, Inc.,* 412 U.S. 609, 613–15, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973); *Florida Breckenridge, Inc. v. Solvay Pharms., Inc.,* 174 F.3d 1227, 1229 (11th Cir.1999), *withdrawn at the request of the court; U.S. v. Atropine Sulfate 1.0 mg. (Article of drug) Dey–Dose,* 843 F.2d 860, 861–62 (5th Cir.1988).

After the Hatch–Waxman Act in 1984, a "generic drug" may be approved without a NDA (and the extensive studies) if it is "therapeutically equivalent" to a brand name or "pioneer" drug. In such cases, an ANDA is required and allows the generic drug manufacturer to demonstrate safety and efficacy by showing that the generic drug is "bioequivalent" to the pioneer drug that has already been approved as safe and effective, 21 U.S.C. § 355(j)(2)(A)(iv), (j)(4)(F), and that the generic drug is a "pharmaceutical equivalent" to the pioneer drug, that is, the active ingredients are the same and the two drugs share the same strength, route of administration and dosage form, 21 U.S.C. § 355(j)(2)(A)(iii); 21 C.F.R. § 320.21(c). Many states require the substitution of less expensive, therapeutically equivalent generic drugs when a brand name drug is prescribed. The "Orange Book" compiles the list of all drugs that the FDA had approved as safe and effective with "therapeutic equivalence determinations" for the generic versions of listed pioneer drugs. See 45 Fed.Reg. 72582 (Oct. 31, 1980); 33 Fed. Reg. 2932 (Jan. 12, 1979). The current, 19th edition, of the Orange Book was admitted as defendant's exhibit ("DE") 375.

**110.** At opening statement on March 22, 2001, Healthpoint agreed that the FDA should decide whether Ethex should be tested under federal law or what the FDCA may require.

**111.** Healthpoint's expert, Mr. Meyer, testified that he would counsel Accuzyme to argue that it is lawfully on the market as GRAS/E or because it is derivatively based on an unspecified pre–1938 drug. Mr. Larry Anderson testified that Healthpoint reverse engineered Panafil White to create Accuzyme. *See also* Ethex's amended counterclaim, docket no. 71 at 4, ¶¶ 11–13 (Accuzyme based on "Panafil White"); docket no. 73 at 6 ¶ 39 (Accuzyme based on "Panafil"); DE 48 at 1 ("All 1995 rev[erse] eng[ineering] work on Panafil White done with lot F–3, which was official at the time of the work. The potency proposed for labeling Accuzyme was therefore based on this work."). The evidence shows that Panafil White was introduced to the market in the mid–1950's; it is not clear when Panafil was first marketed, although Healthpoint alleges it was "pre–1962."

Mr. Meyer also testified that Healthpoint could argue that Accuzyme meets the definition of being "a [prescription] drug product that contains one or more active ingredients first introduced into the marketplace before 1962" which is "marketed based on their manufacturer's belief that such products are not subject to the new drug provisions of the act [FDCA as amended]." DE 381 at 4–5 (FDA policy, Compliance Policy Guide ("CPG") 7132c.02; this exhibit was introduced and first discussed by Ethex's expert, Dr. Rosen). *U.S. v. Sage Pharms., Inc.,* 210 F.3d 475 (5th Cir.2000) (CPG 7132c.02 does not itself exempt any drug from FDA approval

The parties do not dispute that both Accuzyme and Ethezyme are "drugs" within the meaning of the FDCA. There is no evidence that either Accuzyme nor Ethezyme has been the subject of a NDA or ANDA or that Ethex could file an ANDA based on Ethezyme's purported equivalence to Accuzyme (because Accuzyme is not the subject of an approved NDA).The FDA has not taken action to remove Accuzyme from the market, even though Accuzyme has been on the market since 1996, Healthpoint has reported its marketing of Accuzyme in its annual reports to the FDA, the FDA has an open investigation of misbranding of Accuzyme the FDA recently inspected the San Antonio plant in connection with the investigation.[112] It is clear the FDA has had and continues to have the opportunity to decide if further enforcement action is appropriate.[113] Ethezyme's arguments as to

requirements but simply describes how the FDA exercises its enforcement discretion). Under CPG 7132c.02, Healthpoint argues that because Accuzyme is an "unapproved prescription drug first marketed after November 13, 1984" which has the same formulation as a pre–1962 prescription drug not covered by an NDA ("Panafil"), Accuzyme may be marketed unless the FDA states otherwise. DE 381 at 4–5; docket no. 73 at 6, ¶¶ 36–39. Ethex's outside expert also provided an opinion that Panafil White is a pre–1962 prescription drug product where final determination on regulatory or legal status has not been made under FDA policy CPG 7132c.02 (DE 362). Under CPG 7132c.02, a drug has the same formulation if, in sum, it has the same active ingredients in the same quantities and it is a topical preparation that does not contain one or more inactive ingredients not customarily found in such products. *Id.*

Under CPG 7132.02, the FDA has the initiative and responsibility to evaluate the product to determine if it requires an approved NDA or ANDA. There is no evidence that the FDA has contacted Healthpoint to require an approved NDA or ANDA for Accuzyme. Further, although not received into evidence, Mr. Meyer was shown PE 34, pages 1 and 2 of which purport to be a "DESI–2" compliance report by the FDA; there are entries on page 1 for Panafil and page 2 for Panafil White. Mr. Meyer testified that he did not know that the FDA informally had adopted the term "DESI–2" to refer to such pre–1962 prescription drugs not covered by an NDA or post November 13, 1984 drugs based on such drugs, but apparently found such an informal description to be "apt" and, presumably, such a report would suggest that the FDA had initiated the compliance review of Panafil and Panafil White as discussed in FDA policy CPG 7132c.02.

On the other hand, Ethezyme generally has stated that it is on the market because it reverse engineered Accuzyme (docket no. 71 at 9, ¶ 23) and, therefore, is entitled to the same legal status as Accuzyme. Ethex's response to Healthpoint's motion for preliminary injunction argued that "because safety and efficacy are assured through identity with pre–1962 products, no clinical testing is required for successor products ..." (docket no. 111 at 14), in reference to the falsity of Healthpoint's claim that Ethezyme has not tests showing its safety and efficacy and without specifying to which pre–1962 product Ethezyme is "identical." In contrast, Dr. Stephen Schondelmeyer, another Ethex expert, testified that Accuzyme and Ethex each duplicate a drug (not identified) on the market before 1955 and both are based on that pre–1955 product.

**112.** Docket no. 77 at 10; docket no. 121 at 14.

**113.** Although the FDA's amicus brief in *Florida Breckenridge, Inc. v. Solvay Pharms., Inc.*, criticized the District Court in that case for not applying the FDCA's "standards or the applicable regulatory requirements to determine the status of the drugs at issue here," a "crucial omission" (plaintiff's exhibit ("PE") 19, FDA amicus brief, at 16), the FDA also emphasized that a determination of the legal status of the drugs "should be made in the first instance by the FDA" (PE 19, amicus brief, at 15 n. 7) and [i]f there was any doubt ... the court should have referred the matter to the FDA to exercise its 'peculiar expertise' (PE 19, FDA amicus brief, at 16 n. 7) (citation omitted). Unlike *Solvay*, there is no evidence that either Accuzyme nor Ethezyme filed a drug application with the FDA that was rejected. Ethex objected to the introduction of the FDA amicus brief and has argued in a

lawfulness advanced in connection with the preliminary injunction hearing are weaker, but, again, the FDA has had an open investigation since approximately October 2000 regarding Ethex's terming Ethezyme an "alternative"to Accuzyme, implying that Ethezyme is a "generic" of the "brand" Accuzyme, and failing to include a sodium metabisulfite warning in its August, 2000 advertisement of Ethezyme in the "U.S. Pharmacist"[114] and has not taken enforcement action to remove it from the market. It is for the FDA to exercise its discretion to determine whether Accuzyme and Ethezyme are on the market lawfully, whether it be because they are grandfathered or otherwise qualify for any exception to the FDA preclearance process.[115] Resolution of these questions in court would require the "direct interpretation and application of the FDCA ... [which] ... are more appropriately addressed by the FDA, especially in

light of Congress's intention to repose in that body the task of enforcing the FDCA."[116] As in *Summit I and II*, the District Court should not "'determine preemptively how a federal agency will interpret and enforce its own regulations.'"[117]

Other underlying, significant questions—such as whether Accuzyme is a "grandfathered" substitute for Panafil or Panafil White; whether Ethezyme is a "generic" to Accuzyme; whether either Accuzyme or Ethezyme should be required to file a new drug application ("NDA") or abbreviated new drug application (" ANDA"); whether Ethezyme requires FDA approval or rating; whether Healthpoint must change Accuzyme's trade name and NDC number now that Accuzyme's label has changed; whether sodium metabisulfite should be listed as an active ingredient in Ethezyme;[118] whether Ethezyme is not an alternative to Accuzyme

responsive brief (docket no. 198 at 16–19) that it is entitled to no deference. But, the Court finds that the expression of the FDA's position in the Solvay brief is "entitled to respect" to the extent it addresses the FDA's interpretation of the regulation of a "generic" equivalent to an unapproved (exempt) pioneer drug and, especially, as to the need for a uniform definition of such terms as "generic." *Christensen v. Harris County*, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). Further, as a statement of FDA policy, it is entitled to the same consideration as FDA publications and opinions letters offered by Ethex, *e.g.*, DE 376 and 381.

**114.** Docket no. 121, exhibits J and K; PE 25; DE 58.

**115.** 21 U.S.C. § 336; *Heckler v. Chaney*, 470 U.S. 821, 835, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985).

**116.** *Braintree Laboratories, Inc.*, 1997 WL 94237 at * 6. *See also Ciba Corp. v. Weinberger*, 412 U.S. 640, 644, 93 S.Ct. 2495, 37 L.Ed.2d 230 (1973); *Rutherford v. U.S.*, 806 F.2d 1455, 1461 (10th Cir.1986); *North Am.*

*Pharmacal, Inc. v. Dept. of HEW*, 491 F.2d 546, 549 (8th Cir.1973).

**117.** *Summit II*, 933 F.Supp. at 933 (quoting *Sandoz*, 902 F.2d at 223) (citations omitted).

As noted by the record, Ethex has sought to discover information regarding the recipe, assay and methodology for making and testing Accuzyme. The Court declined to compel production of such trade secret information. Before the Ethex called its first witness at the preliminary injunction hearing, Ethex objected to Healthpoint introducing any evidence that Accuzyme had $1.1 \times 10^6$ USP units of papain activity when it was developed or that "Panafil" had $1.1 \times 10^6$ USP units of papain activity and/or that Healthpoint has never changed the formula for Accuzyme. If the District Court agrees that the matters noted above should be deferred to the FDA, then Ethex's threshold argument that the information is relevant to a claim or defense is diminished and Ethex's failure to demonstrate "need" for disclosure of trade secret information is clearer.

**118.** *Weinberger v. Hynson, Westcott & Dunning*, 412 U.S. 609, 624, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973); *Sandoz*, 902 F.2d at 230.

because it contains sodium metabisulfite; whether Ethezyme or Accuzyme need to be tested; whether Healthpoint's test of Accuzyme are sufficient under FDA requirements to show safety and efficacy[119] —are issues which are committed to the FDA and the District Court should decline to address them.

■ Nevertheless, the parties have made numerous other claims that, based on the current record, do not appear to require application or interpretation of FDA regulations or include the FDCA as a "crucial element" of a Lanham Act claim or be tantamount to the private enforcement of the FDCA.[120] Based on the current record it would appear that the following possible claims may be addressed through the Lanham Act, whether: the products are the "same" based on simple comparison of labels; whether either product has falsely claimed it has been approved and/or rated by the FDA; whether Ethezyme's claim that it is the "new standard" for urea products is a misleading claim of superiority; whether Ethex has falsely stated that Ethezyme works better or faster than Accuzyme; whether Ethex has falsely stated that Ethezyme has "full potency" but Accuzyme does not;[121] whether Ethex has falsely stated that Ethezyme is a scientifically advanced or high quality alternative for Accuzyme; whether Ethex has falsely claimed that Accuzyme has potency problems or "the labeled potency claim for Healthpoint's Accuzyme product is being revised downward by 25%;"[122] whether Healthpoint falsely claimed that Ethezyme must be stored "at a cooler temperature than is required for Accuzyme;"[123] whether Healthpoint falsely claimed that a St. Louis area patient "suffered anaphylactic shock from Ethezyme;"[124] whether Healthpoint has falsely stated that Ethezyme has caused severe reactions among patients; whether Healthpoint has falsely stated that the papain in Ethezyme is an insufficient quantity; and whether Healthpoint has falsely claimed that Ethex puts out inferior products. These are claims that, based on the current record, appear to be able to be resolved through a determination of facts and without interpretation of FDA regulations.[125]

■ Perhaps ironically, these more narrow issues did not predominate in the live testimony at the preliminary injunction hearing. Rather, the parties chose to focus on the contention that appears to be at the heart of this case—whether Ethezyme may be advertised as an "alternative" or "equivalent" to and suggested substitute for Accuzyme. Healthpoint argues, in sum, that Ethex has not demonstrated that Ethezyme is therapeutically equivalent or pharmaceutically equivalent or bioequivalent to Accuzyme and, therefore, Ethex should not be allowed to suggest that Ethezyme is freely substi-

---

119.  *See* docket no. 198 at 27–29.  Contrary to the argument addressed in *Zeneca, Inc. v. Eli Lilly & Co.*, 1999 WL 509471 at * 35 (S.D.N.Y.1999), cited by Ethex, Ethex has not demonstrated a likelihood of showing Healthpoint has falsely claimed it has head-to-head tests that show Accuzyme is superior to Ethezyme, only that Healthpoint has said it has tests of Accuzyme and it believes Ethex has no tests of Ethezyme.

120.  *Grove Fresh II.* 1989 WL 152670 at * 2. This is not to say that the FDA's decision on matters within its primary jurisdiction prop-

erly could not moot some or all of the issues or any relief recommended or ordered on the issues.

121.  Docket no. 89 at 9.

122.  Docket no. 89 at 23 (citing exhibit T).

123.  Docket no. 29 at 13.

124.  *Id.* at 14.

125.  *Summit II*, 933 F.Supp. at 935, 936, 940.

tutable, under most state laws, as a "generically" equivalent product. Healthpoint argues that Ethex is free to market and advertise Ethezyme and to encourage physicians to write prescriptions for Ethezyme, but not to place comparative advertisements that falsely suggest that it may be substituted as an equivalent for Accuzyme.[126] To the contrary, Ethex argues that Healthpoint should not be permitted to represent or imply that Ethezyme is not therapeutically equivalent, because Healthpoint has no studies to show that it is not. Ethex argues that to allow Healthpoint to pursue such a claim would require Ethex "to prove bioequivalence to Accuzyme, ...[and] ... in effect, Ethex would be required to submit an ANDA to the FDA for Ethezyme when there is no procedure that would allow for such a filing."[127] In other words, Ethex argues that if it must provide evidence in District Court to demonstrate that it is a "generic" or "equivalent" or "alternative" to Ethyzyme in order to show it may correctly suggest

substitution, the District Court, in effect, would be overruling the "new drug" exemption Ethezyme apparently enjoys and interfering with the FDA's primary jurisdiction. Ethex argues that it should be free to market Ethezyme as an "alternative" to and substitute for Accuzyme, leaving it up to licensed pharmacists and practitioners to determine if substitution is proper under state law and based on patient needs.

It seems clear that in addressing claims of "equivalent to" or "alternative to," the Court should not change the FDA's definitions of such related terms of art as "pharmaceutical equivalents," "therapeutic equivalents," "bioequivalence"[128] and "pharmaceutical alternative."[129] New definitions of FDA terms would undercut national uniformity regarding federal laws regulating the drug market or would confuse the public and undermine confidence in the drug supply in general and generic drugs in specific.[130] Although Lanham Act or related common law claims that concern whether Ethezyme is "the same as" Accuz-

---

**126.** Healthpoint has submitted a notebook containing relevant portions of each state's laws on the substitution of drugs (docket no. 177). Healthpoint argues that most states require therapeutic equivalence of bioequivalence before a drug may be substituted. In Texas (docket no. 177, tab 44), §§ 562.001(1), 562.002, 562.003, 562.009 and 562.012, TEX. OCCUPATIONS CODE (West, 2000), allows the pharmacist to substitute a "generically equivalent" drug, that is, "a drug that is pharmaceutically equivalent and therapeutically equivalent to the drug prescribed." "Pharmaceutical equivalence" is defined as "identical amounts of same active chemical ingredients in same dosage form and that meet the identical ... standards of strength, quality and purity according to the [USP] or other nationally recognized compendium." "Therapeutic equivalence" is defined, in essence, as bioequivalence. A pharmacist needs the practitioner's consent to substitute a drug with different amounts of active ingredients.

**127.** Docket no. 111 at 27–28.

**128.** *U.S. v. 50 Boxes, More or Less*, 909 F.2d 24, 25 (1st Cir.1990) (terms in the FDCA do

not carry their "ordinary English-language meanings"). *See also U.S. v. 225 Cartons, More or Less*, 871 F.2d 409, 413 (3rd Cir. 1989) ("General recognition in this context is a term of art.").

**129.** PE 9.

**130.** The FDA's amicus brief in *Solvay Pharms., Inc.*, emphasized the need for a consistent determination of generic equivalence:

Nor is there any room in federal law for a standard that defines generic equivalence in a manner inconsistent with the FDA's therapeutic equivalence standard. The statutory requirement of bioequivalence is an essential component of that standard and is a bulwark in the system of drug preclearance regulations designed to ensure the safety and efficacy of drugs on the market today. The district court's decision [referring to chemical equivalence] could undermine the FDA's ongoing efforts to protect the public from untested and unapproved drugs sold in violation of federal law.
PE 19, FDA amicus brief, at 10–11.

yme—to the extent that determination requires a simple comparison of ingredients and does not entail a decision on whether sodium metabisulfite should be listed as an active ingredient -appear to be properly before the District Court, a determination of whether Ethezyme is "equivalent" to Accuzyme appears to be inextricably linked to the determination of whether Ethezyme is being marketed lawfully,[131] a matter within the exclusive enforcement domain and "peculiar expertise" of the FDA.[132] Similarly, "the task of identifying in the first instance whether one drug is the generic equivalent of another" belongs to the FDA, "the government agency with extensive technical and scientific expertise in the area."[133] The term "alternative" is less problematic, perhaps because the parties appear to agree that Ethezyme likely

**131.** One of Ethex's arguments on the lawfulness of the marketing of Ethezyme is that Ethezyme is "equivalent to" Accuzyme and is entitled to the same exemptions from pre-approval as Accuzyme. It is undisputed that Ethex has no tests showing the safety and efficacy of Ethezyme and that Accuzyme is not a pre–1938 product (the only exceptions to the definition of "new drug;" *see* notes 109 and 111, above). Thus, Ethezyme's similarity to Accuzyme appears to be of heightened importance to its claim to lawfulness.

On a related point, Ethex has argued that the Court should reject Healthpoint's argument that Ethezyme is "not the same as" or is not "equivalent to" Accuzyme because Ethezyme contains sodium metabisulfite and because a "generic" may contain different inactive ingredients or excipients. But, because Ethezyme is based on Accuzyme and Accuzyme is not FDA-approved, Ethezyme cannot be a "generic" of Accuzyme within the technical meaning of the FDA policy. PE 19 and PE 20 at 1 ("A generic drug is identical or bioequivalent to a brand name drug in dosage form, strength, safety, route of administration, quality, performance characteristics and intended use.... Drug companies must submit an abbreviated new drug application (ANDA) for approval to market a generic product."). Therefore, Ethex's argument misses the mark.

Further, Ethex's position that sodium metabisulfite is not an active ingredient or "incipient" does not account for the United States Supreme Court's decision in *U.S. v. Generix Drug Corp.*, 460 U.S. 453, 103 S.Ct. 1298, 75 L.Ed.2d 198 (1983). In *Generix*, a drug distributor argued that the active ingredients in its generic drug were identical to those in a pioneer drug that had already been approved and, therefore, the generic did not require FDA approval. The district court granted an injunction to prevent the distribution of the generic without FDA approval, holding that a generic containing the same active ingredi-

ents as an approved pioneer drug is a "new drug" if there is a reasonable possibility that the differences in the "inactive 'excipients' (such as coatings, binders and capsules)" will make the generic less safe and effective and finding that "differences in excipients may affect the safety and effectiveness of the drug products" because they "may effect the rate at which the [drug's] active ingredient is delivered." 460 U.S. at 454, 455, 103 S.Ct. 1298. The Fifth Circuit Court of Appeals vacated the injunction and the United States Supreme Court reinstated the injunction based on the record in the district court. Ethex has not proved that sodium metabisulfite is an inactive ingredient that does not affect the rate at which papain is delivered. *See* PE 5 (Worthington Catalog: "Papain is activated by ... sulfite."). In any event, it is recommended that the determination of whether the presence of sodium metabisulfite in Ethezyme requires Ethezyme to obtain an NDA or ANDA should be deferred to the FDA.

**132.** *Weinberger v. Bentex Pharms., Inc.*, 412 U.S. 645, 653–54, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973); *Abruzzi Foods, Inc. v. Pasta & Cheese, Inc.*, 687 F.Supp. 20, 21 (D.Mass. 1988) ("Under the doctrine of separation of powers, the Court lacks the authority to create a standard of what constitutes 'freshness' in the pre-packaged pasta industry.").

**133.** PE 19 at 21. Although it has been argued that "generic" has not been defined by statute, the Office of Generic Drugs' definition (PE 20) and the Orange Book's coding system which provides determinations of "therapeutic equivalence" to be used in making substitution decisions, bioequivalence and therapeutic equivalence are required for an FDA determination a drug is a "generic" equivalent. In *Solvay*, the FDA argued for implementation of an unvarying definition of "generic" in reference to the two un-approved

is a "pharmaceutical alternative" to Accuzyme, as defined by the FDA,[134] and because "alternative" does not imply identity or equivalence.

■ Nevertheless, the primary jurisdiction of the FDA would not appear to bar the District Court from deciding Healthpoint's false advertising claim that Ethex falsely advertised Ethezyme by making specific false or misleading representations (e.g., same active ingredients in same amounts). There is a distinction between respecting the FDA's primary jurisdiction to determine in the first instance whether a drug is lawful, "generic," "bioequivalent," "therapeutically equivalent," or "pharmaceutically equivalent" and, on the other hand, a Lanham Act claim that a false statement has been made about a product.[135] Even though the FDA has not required Ethex to demonstrate its equivalence to Accuzyme, Ethex is not free to make false or misleading statements about

its product.[136] To hold to the contrary would mean that an administrative scheme could eviscerate a Lanham Act or related claim over which the agency has no jurisdiction. For example, if Ethex represents that Ethezyme has "the same active ingredients in the same quantities as Accuzyme," the consumer and competitors have a right to expect that the representation has factual support. Conversely, the FDA's primary jurisdiction also should not bar the District Court from deciding Ethex's claim that Healthpoint made false or misleading statements about Accuzyme (e.g., Healthpoint has claimed or implied that Accuzyme has FDA approval and that Ethezyme needs FDA approval or an "AB" rating to be substitutable).[137] Either side's key false advertising contentions are not merely claims that a drug falsely implied it has been approved by the FDA without any additional allegation of falsity;[138] rather, each is a claim of false or

drugs which were the subject of that case (PE 19 at 8).

134. Healthpoint itself has used the word "alternative" in comparing Accuzyme to Ethezyme (DE 31). *See also* DE 6 ("Accuzyme recommended as a therapeutic alternative to Elase").

135. *C.f., In re Genentech, Inc. Securities Litig.,* 1989 WL 106834 *2 (N.D.Cal.) ("If primary jurisdiction of the FDA were appropriate whenever an action presented complex medical and pharmacological issues, the FDA would virtually have no time to regulate drugs. The agency would be required to pass on such issues in all drug patent litigation, product liability litigation and all other litigation, which is by no means *de minimis,* in which such issues are raised.").

136. As a policy matter, Ethex has advanced no reason why the FDA would require "comparability or superiority" claims to be "demonstrated by substantial evidence or substantial clinical experience" when dealing with pre-approved drugs (PE 18 at A–109), but allow exempt drugs to be comparatively marketed with no factual support. *See* docket no.

41, appendix, exhibits N through Q (FDA warning letters sent to makers of grandfathered drugs demanding that they cease making claims that a drug is "interchangeable" with or a "substitute" for or "can be used in place of" another drug, since such claims imply equivalence but the FDA has not determined equivalence or interchangeability).

137. Docket no. 29 at 9 n. 3 and exhibits D and E (FDA finds that the use of the term "standard" to describe an un-approved drug is "misleading.").

138. *Barr Labs., Inc. v. Bolar Pharm.Co.,* No. 91–4374 (D.N.J., July 13, 1992)("*Bolar*") (plaintiff alleged that defendant falsely represented its products were *"bona fide* generic substitutes") (cited and described in *Eli Lilly & Co. v. Roussel Corp.,* 23 F.Supp.2d 460, 479 n. 29). *But see Barr Labs., Inc. v. Quantum Pharmics, Inc.,* No. 90 Civ. 4406 (E.D.N.Y.Feb.2, 1994) (*"Barr Labs. II"*) (also cited and described in *Eli Lilly & Co.*). *Barr Labs., II* was entered after Barr Labs. amended its complaint and alleged that Quantum had used the terms "Generic," "Bioequivalent," and "dependable alternatives to brand-

misleading comparisons between two specific products in the context of comparative advertising and promotion relating to whether one drug can be substituted for another under state law. As in *Mylan*, dismissal of such claims at this stage would be inappropriate.[139]

■■■ In sum, it is recommended that issues that require direct application or interpretation of the FDCA or its implementing regulations or FDA policies[140] should not be addressed by the District Court; neither Ethex nor Healthpoint have demonstrated likelihood of succeeding on the merits on any issue that requires the District Court to directly apply or interpret the FDCA, implementing regulations or FDA policies. On the other hand, at this stage of the pleading, it appears that other issues are able to be resolved without the direct application or interpretation of the FDCA, implementing regulations or FDA policies.[141] Whether

name drug products," terms which "carry an informational load that includes assurances of the manufacturer's compliance with the FDA approval procedure," to falsely imply that Quantum's drug products were lawfully proven and validly found by the FDA to be bioequivalent. The court held that such a claim "must fail under *Mylan*." 23 F.Supp.2d at 478. Unlike the plaintiff in *Mylan*, plaintiff did not allege specific false or misleading representations, such as "Quantum's drugs were not bioequivalent to the innovator drug." *Id*. The court in *Eli Lilly & Co*. found that, as in *Barr Labs, II*, "Lilly has not alleged that defendants made false representations as to the quality, bioequivalency or safety of its products." *Id*. Unlike *Eli Lilly* in which the district court concluded that "[t]he Lanham Act does not provide a right of action with respect to implied representations that defendants obtained FDA approval" (23 F.Supp.2d at 479–80), Healthpoint has alleged that Ethex has made false representations as to the quality of Ethezyme. Healthpoint has not merely alleged "that certain terms and phrases carry an informational load," but also has alleged "positively" a false statement (same active ingredients in same quantities).

**139.** *Mylan Labs.*, 7 F.3d at 1138 (false claims of bioequivalence, generic equivalence and entitlement to an AB rating were actionable under the Lanham Act when Mylan alleged that the bioequivalence studies had been "falsified" or was seriously "unreliable"); *Rhone–Poulenc Rorer Pharms., Inc. v. Marion Merrell Dow, Inc.*, 93 F.3d 511, 513, 516 (8th Cir.1996) (ads featuring two different images with dramatically different prices with the slogan "which one would you choose" falsely represented that the two drugs could be "indiscriminately substituted" but the generic had been classified by the FDA as "BC" rather than "AB," meaning that the drugs were

not necessarily "bioequivalent" and could only be substituted by a physician); *Eli Lilly*, 23 F.Supp.2d at 479 n. 29 ("*Bolar* is consistent with *Mylan* . . . because it upheld a Lanham Act claim where defendant misrepresented a comparison between a generic drug and the brand name drug."). On April 9, 2001, Healthpoint filed two motions for partial summary judgment (docket nos. 187 and 188).

**140.** These claims include Accuzyme's alleged misbranding, whether Accuzyme should change its trade name and NDC number, whether Accuzyme or Ethezyme are on the market lawfully, whether Ethezyme in face is a "generic" for or "equivalent" to Accuzyme (*see* FDA amicus brief in Solvay, PE 19 at 21), whether sodium metabisulfite should be listed as an active ingredient on Ethezyme, and whether Healthpoint's studies do not meet the FDA's requirement for proof of safety and effectiveness. .

**141.** These claims include whether: Accuzyme's label error as to USP units of papain falsely advertised the product; the products are the "same" based on simple comparison of labels; either product has falsely claimed it has been approved and/or rated by the FDA; Ethezyme's claim that it is the "new standard" for urea products is a claim of superiority that cannot be made without research or clinical evidence to support the claim; Ethex has falsely stated that Ethezyme works better or faster than Accuzyme; Ethex has falsely stated that Ethezyme has "full potency" or more papain activity than Accuzyme; Ethex has falsely stated that Ethezyme is a scientifically advanced or high quality alternative for Accuzyme; Ethex has false claimed that Accuzyme has potency problems or "the labeled potency claim for Healthpoint's Accuzyme

or not either side has demonstrated a likelihood of success on any of those issues is addressed below. It is recommended that Ethex's motion to stay all claims indefinitely pending the conclusion of the FDA's investigation the misbranding issue [142] or the pending the determination of all FDA "core issues" which "permeate every aspect of this case" [143] should be *denied.* There has been no showing that any of these issue would resolve this lawsuit unless, of course, the FDA were to decide that Accuzyme and Ethezyme were on the market illegally. Further, it is recommended that the portion of Healthpoint's cross-motion to dismiss that requests dismissal of Ethex's claim of misbranding should be *granted.* Ethex's motion to dismiss all of Healthpoint's claims due to unclean hands and Ethex's alternative request that Healthpoint be denied any injunctive relief due to unclean hands as well as the remaining portion of Healthpoint's motion to dismiss that requests the dismissal of Ethex's unclean hands claims or defenses are discussed below.

## C. *Unclean Hands*

The doctrine of unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." [144] Although equity does not demand that the parties "have led blameless lives ... it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue." [145] For the doctrine to apply, a party's conduct does not need to be one punishable as a crime or one that would justify legal proceedings of any sort. [146] "Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause" for the court to invoke the doctrine. [147] The wrongful acts upon which the claim of unclean hands is premised must "in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication." [148] Plaintiff's alleged wrongdoing will not bar relief unless

product is being revised downward by 25%;" Healthpoint falsely claimed that Ethezyme must be stored "at a cooler temperature than is required for Accuzyme;" Healthpoint falsely claimed that a St. Louis area patient "suffered anaphylactic shock from Ethezyme;" Healthpoint has falsely stated that Ethezyme has caused severe reactions among patients; Healthpoint has falsely stated that the papain in Ethezyme is an insufficient quantity; Healthpoint has falsely claimed that Ethex puts out inferior products; and Ethezyme has falsely claimed it is a "generic" or "equivalent" to Accuzyme without sufficient substantiation.

**142.** Docket no. 122 at 8–9; docket no. 198 at 7.

**143.** Docket no. 198 at 8.

**144.** *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.,* 324 U.S. 806, 814, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945). The Supreme Court held that dismissal of

Automotive's claims for patent infringement and breach of contract because Automotive knew the application for patent rights was fraudulent and infected with perjury. *Id.* at 819, 65 S.Ct. 993.

**145.** *Id.* at 814–15, 65 S.Ct. 993 (citations omitted).

**146.** *Id.* at 815, 65 S.Ct. 993.

**147.** *Id.*

**148.** *Mitchell Bros. Film Group v. Cinema Adult Theater,* 604 F.2d 852, 863 (5th Cir. 1979) (quoting *Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 245, 54 S.Ct. 146, 148, 78 L.Ed. 293 (1933) and holding that unclean hands doctrine based on claim that public was harmed by plaintiff's production of obscene materials would not bar plaintiff's copyright infringement claim because the alleged wrongful conduct did not change equities between parties and defendant was

the defendant establishes personal injury resulting from plaintiff's conduct.[149] The unclean hands doctrine "does not purport to search out or deal with the general moral attributes or standing of a litigant." [150]

The doctrine of unclean applies to preliminary injunctions [151] and affords the equity court broad discretion in rejecting an unclean litigant's claims.[152] However, the doctrine should "not be used as a loose cannon, depriving plaintiff of an equitable remedy ... merely because he is guilty of unrelated misconduct." [153] In applying, the unclean hands doctrine, the court must consider the situation as it existed at the time of the suit.[154]

Equity denies relief "where the plaintiff is misrepresenting to the public the nature of his product either by the trademark itself or by his label." [155] Unclean hands is a defense to a Lanham Act claims such as trademark infringement and unfair competition.[156] As the Supreme Court said in *Clinton E. Worden & Co. v. California Fig Syrup Co.:* [157]

[W]hen the owner of a trade-mark applies for an injunction to restrain the defendant from injuring his property by making false representations to the public, it is essential that the plaintiff should not in his trade-mark, or in his advertisements and business, be himself guilty of any false or misleading representation; that if the plaintiff makes any material false statement in connection with the property which he seeks to protect, he loses his right to claim the assistance of a court of equity; that where any symbol or label claimed as a trade-mark is so constructed or worded as to make or contain a distinct assertion which is false, no property can be claimed on it, or, in other words, the right to the exclusive use of it cannot be maintained.[158]

Equity affords no protection to a party who is guilty of "materially false or misleading advertisements or business relative to the trademark." [159] A Lanham Act de-

not harmed), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1277, 63 L.Ed.2d 601 (1980).

149. *Id.*

150. *Id.*

151. *American Hosp. Supply Corp. v. Hospital Prod. Ltd.*, 780 F.2d 589, 601 (7th Cir.1986).

152. *Precision Instrument*, 324 U.S. at 815, 65 S.Ct. 993.

153. *American Hosp.*, 780 F.2d at 601 (refusing to find unclean hands because plaintiff's false advertising was unrelated to alleged breach of contract).

154. *Recamier Mfg. Co. v. Harriet Hubbard Ayer, Inc.*, 59 F.2d 802, 808 (S.D.N.Y.1932).

155. *Morton Salt Co. v. G.S. Suppiger Co.*, 314 U.S. 488, 494, 62 S.Ct. 402, 406, 86 L.Ed. 363 (1942) (petition for injunctive relief dismissed because patentee was using patent to restrain competition); *Strey v. Devine's*, 217 F.2d 187, 190 (7th Cir.1954) (dismissing cause of action because plaintiff was not licensed doctor as misrepresented on product label and that

plaintiff did not properly list all ingredients as required by FDA).

156. *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 272 (5th Cir.1999) (citing *Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1313 (9th Cir. 1997)) and (vacating and remanding preliminary injunction proceeding for determination of whether unclean hands barred plaintiff's Lanham Act claim of unfair competition).

157. 187 U.S. 516, 23 S.Ct. 161, 47 L.Ed. 282 (1903). The Court found that the doctrine of unclean hands barred trademark infringement claims where plaintiff's product, deceptively labeled as "Syrup of Figs," did not contain figs. *Id.* at 539, 23 S.Ct. 161. The Court noted whether or not the product initially contained figs was not justification for continuing to use the description after fig juice was no longer a material ingredient. *Id.* at 536–37, 23 S.Ct. 161.

158. *Id.* at 528, 23 S.Ct. 161.

159. *Recamier Mfg.*, 59 F.2d at 808 (citations omitted) (refusing to apply unclean hands

fendant must show that "plaintiff's conduct is inequitable and that the conduct relates to the subject matter of [plaintiff's] claims."[160] In a claim for false advertising, the unclean hands of the plaintiff must relate to the same product the defendant allegedly falsely advertised.[161] A court may reject the doctrine where the "failure to grant an injunction would only increase the damage inflicted on the buying public."[162] The unclean hands doctrine should not bar Lanham Act claims when the doctrine is premised on allegations of noncompliance with the FDCA because such a use of the doctrine would essentially permit a private enforcement action—a power reserved for the FDA.[163]

Courts have applied the doctrine of unclean hands to bar equitable relief in cases involving trademark infringement, false advertising, and unfair competition. In *Strey v. Devine's*,[164] the Seventh Circuit found that plaintiff's use of the designation "Dr." on his product label, although plaintiff was not a licensed physician, could mislead the public into believing the product was prescribed by a doctor.[165] Additionally, the court found that under the FDCA, plaintiff's product was misbranded because the label did not list all ingredients. The Seventh Circuit affirmed the dismissal of plaintiff's claims for trademark infringement and unfair competition, finding the claims barred by unclean hands.[166]

In *Haagen–Dazs, Inc. v. Frusen Gladje Ltd.*,[167] Haagen–Dazs claimed that the defendant had violated the Lanham Act by packaging their product in a way to benefit from Haagen–Dazs' exclusive marketing technique.[168] Among the complaints was the allegation that the defendant's container was intended to deceive the public into believing the product was produced in Sweden when the product actually derived from an American recipe and was produced in Pennsylvania.[169] In denying the preliminary injunction, the court found that Haagen–Dazs' hands were equally unclean because its container also gave the impression the product was from Scandinavia when it was actually of domestic origin.[170]

Other courts have rejected the unclean hands defense as applied to Lanham Act cases. In *Levi Strauss & Co. v. Shilon*,[171] the defendant had offered for sale to a Levi Strauss undercover investigator un-

doctrine to false representations regarding other trademarks because they were not closely related to trademark at issue).

**160.** *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 847 (9th Cir.1987) (quoted by *Sugar Busters*, 177 F.3d at 272) and (affirming district court's decision to not instruct jury on unclean hands because Fuddruckers' description of hamburger meat as "ground steak" was not major part of trade dress which was allegedly infringed).

**161.** *Alpo Petfoods, Inc. v. Ralston Purina Co.*, 720 F.Supp. 194, 214 (D.D.C.1989) (citations omitted), *aff'd in part and rev'd in part on other grounds*, 913 F.2d 958 (1990).

**162.** *Id.* (refusing to apply equitable defenses where worst effects of both parties' advertising had been felt by public).

**163.** *Inmuno Vital, Inc. v. Golden Sun, Inc.*, 49 F.Supp.2d 1344, 1359 (S.D.Fla.1997) (citations omitted).

**164.** 217 F.2d 187 (7th Cir.1954).

**165.** *Id.* at 189–90.

**166.** *Id.* at 190.

**167.** 493 F.Supp. 73 (S.D.N.Y.1980).

**168.** *Id.* at 74.

**169.** *Id.* at 75–76.

**170.** *Id.* at 76. It is not clear from the opinion whether the defendant raised the issue of unclean hands or whether the court considered the matter *sua sponte*.

**171.** 121 F.3d 1309 (9th Cir.1997).

branded and untagged jeans bearing Levi trademarked stitching.[172] He provided the investigator with the Levi tags and labels which could be sewn into the jeans at locations outside of the United States.[173] The defendant argued that Levi Strauss's Lanham Act claims for trademark infringement were barred by the doctrine of unclean hands because the company's investigator had entrapped him.[174] The Ninth Circuit affirmed the district court's finding that unclean hands did not bar Levi Strauss's Lanham Act claims because the defendant had not proved entrapment.[175]

In *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*,[176] Fuddrucker's sought to enjoin defendant's trade dress infringement. The district court denied defendant's request for a jury instruction regarding the unclean hands doctrine on the theory that Fuddrucker's misled the public by describing its hamburger meat as "ground steak." [177] Affirming the district court's refusal to instruct, the Ninth Circuit noted that unclean hands is a defense to a Lanham Act claim and explained that Fuddrucker's representations the meat was "ground steak" were immaterial in a trade dress infringement claim.[178]

In *Inmuno Vital, Inc. v. Golden Sun, Inc.*,[179] a summary judgment case, Golden Sun raised the affirmative defense of un-clean hands based on Inmuno's non-compliance with FDCA regulations; advertising that a percentage of product profits would be donated to medical research; misbranding; and advertising that the product would cure certain diseases.[180] A Florida district court refused to apply the doctrine, finding that Golden Sun had failed to establish that the product did not contribute to cures and that Inmuno's statements of contributions to medical research were essentially true.[181] In addition, the court refused to find misbranding when the United States Patent and Trademark Office had accepted that the product was properly identified.[182] Finally, the court rejected Golden Sun's non-compliance claims because such claims were for the FDA to resolve.[183]

In *ALPO Petfoods, Inc. v. Ralston Purina Co.*,[184] a District of Columbia district court refused to use the unclean hands doctrine to bar either party's claim for equitable relief based on allegations of false advertising.[185] The court found that Ralston had falsely advertised that Puppy Chow promoted hip joint laxity and lessened the severity of canine hip dysplasia and that Alpo had falsely advertised its puppy food was preferred by veterinarians over the "leading brand" (at that time Puppy Chow) as well as competing brands.[186] Nevertheless, the court concluded that "the worst effects of ALPO's

**172.** *Id.* at 1311.

**173.** *Id.*

**174.** *Id.* at 1313.

**175.** *Id.* at 1313.

**176.** 826 F.2d 837 (9th Cir.1987).

**177.** *Id.* at 847.

**178.** *Id.* at 847. *See also Inmuno Vital, Inc.*, 49 F.Supp.2d at 1361 (finding Lanham Act claim was not barred by allegedly illegal curative claims because no evidence established claims were false and because "cancer cure"

was collateral to trademark at issue "Vida Vital").

**179.** 49 F.Supp.2d at 1344.

**180.** *Id.* at 1359.

**181.** *Id.* at 1360.

**182.** *Id.*

**183.** *Id.*

**184.** 720 F.Supp. at 194.

**185.** *Id.* at 214.

**186.** *Id.* at 214–216.

and Ralston's conduct have been visited on the buying public ... the equitable defenses raised cannot bar relief which is necessary and in the public interest." [187]

These cases show that a plaintiff's product will not be protected if plaintiff's own unclean acts regarding the product can deceive the public or are essentially the same as the conduct of which plaintiff is complaining. On the other hand, if the party raising the defense cannot prove the allegations of unclean conduct or if the alleged acts are not related to the opponent's claims, the unclean hands doctrine will be rejected. In addition, the courts will not employ the doctrine when the defensive allegations are based on claims reserved for resolution by an administrative agency or on claims that contradict an agency's determinations. More importantly, if applying the doctrine would permit both parties to continue conduct detrimental to the public, the application of the doctrine will be rejected.

■ In the case at hand, as noted in the section of this report immediately above, Ethex has moved to dismiss all of Healthpoint's claims because of the alleged misbranding of Accuzyme or because

Healthpoint has not demonstrated Accuzyme is being marketed legally and relatedly has argued that Healthpoint's unclean hands based on alleged misbranding bars the award of any injunctive relief to Healthpoint.[188] Healthpoint has moved to dismiss Ethex's unclean hands claim or defense on the ground that it "requires interpretation and application of FDA regulations." [189] As in *Inmuno Vital* and as discussed above, Ethex is asking the Court to determine that Healthpoint has violated the FDCA through misbranding, a matter best left for the FDA to determine.[190] Therefore, the Court recommends that Ethex's motion to dismiss all of Healthpoint's claims and to deny Healthpoint any injunctive relief due to unclean hands be *denied.* It is also recommended that the remaining portion of Healthpoint's motion to dismiss that requests the dismissal of Ethex's unclean hands defense based on misbranding should be *granted* and Ethex's unclean hands defense based on alleged misbranding should be *dismissed.*

■ Ethex has also argued that Healthpoint has unclean hands because Accuzyme is "not lawfully on the market as the replicate of Panafil White." [191] As

187. *Id.* at 214.

188. Docket no. 122 at 7.

189. Docket no. 175 at 25.

190. *Buckman Co. v. Plaintiff's Legal Comm.,* 531 U.S. 341, 121 S.Ct. 1012, 1020, 148 L.Ed.2d 854 (Feb. 21, 2001) (state law "fraud on the FDA" claims in which "the existence of ... federal enactments [involving pre-market approval requirements for medical devices were] a critical element in their case," were preempted by the FDCA, as amended by the Medical Device Amendments); *General Mills, Inc. v. Health Valley Foods,* 24 U.S.P.Q.2d 1270, 1274–75 (T.T.A.B.1992) (unclean hands defense rejected even though minor violation of FDCA misbranding provision admitted because the Board could not anticipate how the FDA would deal with the violation). *See also Inmuno Vital v. Golden Sun, Inc.,* 49

F.Supp.2d 1344, 1359 (S.D.Fla.1997). *Genderm Corp. v. Biozone Labs.,* No. 92 C 2533, 1992 WL 220638, 1992 U.S. District LEXIS * 8527 (N.D.Ill. Sept. 3, 1992), relied on by Ethex (docket no. 198 at 22) is distinguishable because the very ingredient approved as safe and effective by the FDA was misrepresented as being an active ingredient of Biozone's topical analgesic when, in fact, it contained a synthetic substitute which had not been recognized by the FDA as safe and effective. *Id.* at * 25–28, 1992 WL 220638.

191. Docket no. 111 at 9. Ethex introduced into evidence a "Project Knock–Out Q & A" which falsely states that "Accuzyme is a grandfather drug, pre–1962" (DE 31). Citing its deposition excerpts from Mr. Maverick's deposition for support in closing argument, Ethex argues that claim is "literally false." But, Mr. Maverick testified only that "I don't

an apparent variation of its unclean hands argument, Ethex argues in its response to Healthpoint's motion to dismiss that Healthpoint is not entitled to any relief from the Court because it has not shown that Accuzyme is legally marketed.[192] Healthpoint has moved to dismiss this unclean hands defense arguing that Ethex is bound by its factual assertions in pleadings that both Ethezyme and Accuzyme are exempt from the FDA's "new drug" requirements.[193] In addition, Healthpoint argues that the undisputed evidence from the preliminary injunction hearing establishes that Accuzyme is legally on the market.[194] Alternatively, Healthpoint argues that whether Accuzyme is a legal drug is open to "speculation, surmise, or interpretation," which will not support an unclean hands defense.

As an initial matter, Ethex's argument is not without problems. Ethex has readily argued that it is "in the same position as Accuzyme" and is relying on most, if not all, of the same arguments as Accuzyme to show Ethezyme is being marketed legally. Ethex has contended that in formulating Ethezyme, it "reversed engineered" Accuzyme. Therefore, if the FDA should determine that Accuzyme is not marketed lawfully, Ethex would be required to withdraw Ethezyme as well.

Ethex argues that the FDA's position in the *Solvay* brief is entitled to no deference from the Court, but if it is considered, Accuzyme cannot meet the test for the GRAS/E or grandfather exceptions as explained in that brief.[195] However, Mr. Meyer provided expert testimony that although Accuzyme is not a "pre–1962 prescription drug which is not covered by an NDA" within the meaning of CPG 7132c.02 (not addressed in the *Solvay* brief), the FDA could determine that Panafil White is such a drug and, since Accuzyme is based on Panafil White, that Accuzyme is lawfully marketed without further FDA approval.[196] The parties agree that administrative scheme applicable to Accuzyme and Ethezyme provides that some drugs can be marketed without FDA pre-approval *unless* the FDA intervenes affirmatively to say otherwise. Accuzyme has been openly marketed and reported to the FDA since 1996 without pre-approval and the FDA has taken no action against Accuzyme, even though the FDA visited the San Antonio plant in 2000 in a misbranding investigation. Under these circumstances, the Court cannot determine that Healthpoint has "unclean hands" or lacks standing due to it failure to have affirmative proof that pre-approval is not required.[197]

For these reasons, the Court recommends that the remaining portion of

know if that's true" that "Accuzyme is grandfather drug pre 1962" (docket no. 166 at 370). As noted, the ultimate question of the lawfulness of either of these drugs is a matter for the FDA.

**192.** Docket no. 198 at 18–19.

**193.** Docket no. 175 at 22. Ethex's pleadings alleged that Accuzyme has a valid grandfather exception. Docket no. 71 at 10, ¶ 26 ("Ethezyme and Accuzyme are exempt from the FDA pre-market approval requirements for 'new drugs' under 21 U.S.C. § 355.") and at 11, ¶ 28.

**194.** *Id.* at 23.

**195.** Docket no. 198 at 16–18; *see* notes 109 and 113, above.

**196.** *See* note 111, above.

**197.** If the Court were to stay this action pending affirmative intervention by the FDA, as Ethex requests, the Court in effect would be interfering with the FDA's own administrative scheme which permits some drugs to be marketed without pre-approval or other affirmative action from the FDA. If this Court were to dismiss all of Healthpoint's claims because it cannot establish Accuzyme's lawful presence on the market without affirmative action from the FDA, as Ethex alternatively requests, then so long as the Court continued to defer to the FDA to decide if Accuzyme or Ethezyme should be removed from the market, there would be no recourse in District Court for Lanham Act and other causes of action

Healthpoint's motion to dismiss that asks for the dismissal of Ethex's unclean hands defense based on whether Accuzyme is legally on the market is *granted* and Ethex's unclean hands defense based on the argument that Accuzyme should not be on the market at all should be *dismissed.*

As a final matter relating to unclean hands, the Court notes that Healthpoint also has raised the issue of Ethex's unclean hands in a sur-reply to Ethex's motion for preliminary injunction.[198] Although the question of Ethex's unclean hands was not raised in either motion to dismiss, the Court includes the issue here to complete the discussion of related arguments. According to Healthpoint's arguments, Ethex's request for equitable relief for the misbranding and mislabeling claims was pre-empted on January 29, 2001, when Ethex disseminated to the pharmaceutical market a letter disparaging Accuzyme, based in part, on protected information obtained during discovery.[199] Healthpoint contends that by this unclean conduct, "Ethex fashioned for itself a kind of vigilante relief far more severe than any 'equitable' relief that it could have hoped for from this Court."[200] In addition, the Court notes that evidence shows Ethex performed tests on Accuzyme and determined that Accuzyme consistently tested for papain levels lower than the label claimed. Ethex advertised Ethezyme as having the same active ingredients in the same amounts as Accuzyme. There is no evidence that upon learning Accuzyme did

not have a papain activity level of 1.1 × $10^6$ as measured by lot G that Ethex sent package inserts or undertook advertising to notify customers that Ethezyme did not have the same ingredients in the same amounts as Accuzyme.

Unlike Ethex's arguments of unclean hands raised against Healthpoint, this conduct does not require interpretation of FDA law, regulations or policies. This conduct also relates to the false advertising claims which are the focus of the motion for preliminary injunction. Although this report does not recommend an award of preliminary injunctive relief on behalf of Ethex, Ethex's based on an assessment of likelihood of success and the other three factors, unclean hands would provide an alternative basis for denying Ethex's motion for preliminary injunction.

In sum, Healthpoint's motion to dismiss Ethex's unclean hands claims and defenses should be *granted* because each of Ethex's arguments focus on matters which require the direct application or interpretation of the FDCA, implementing regulations or FDA polices. On the other hand, Ethex's motion to dismiss all of Healthpoint's claims and Healthpoint's request for injunctive relief should be *denied.*

## D. Entitlement to a Preliminary Injunction

A district court has broad discretion when ruling on requests for preliminary injunctions. When, as here, the requested preliminary relief would award movant substantially the relief it would obtain af-

over which the FDA has no jurisdiction event though both drugs were still on the market.

**198.** Docket no. 109 at 3.

**199.** *Id.* at 2. The Court notes that on March 9, 2001, an Order (docket no. 118) was entered denying Healthpoint's sealed motion for protective order and sanctions which was based on the January 29, 2001 letter. The same

day, the Court entered a report (docket no. 119) recommending that Healthpoint's sealed motion for civil contempt (docket no. 76) should be denied. Neither the order or the report considered the issue of whether unclean hands should bar Ethex's request for equitable relief.

**200.** *Id.* at 1.

ter a trial on the merits, the Court must be particularly deliberate when weighing the four prerequisites for injunctive relief.[201] The discussion will first address the Healthpoint's palming off claim as a basis for injunctive relief, then will address the elements of the parties' false advertising claims, and then will address the evidence as it relates to likelihood of success, and finally will address the other three elements for issuance of a preliminary injunction.

### 1. Likelihood of Success on the Merits

#### a. "palming off"

██ Healthpoint also requests a preliminary injunction based on its argument that Ethex is "palming off" [202] Ethezyme as being "equivalent to," a "generic of," or an "alternative" or "substitute" for Accuzyme.[203] Healthpoint contends that Ethex "misleads pharmacists into believing that it has the FDA's blessing to substitute Ethezyme ointment for Accuzyme ointment prescriptions." [204] According to Healthpoint's arguments, in many states—including Texas—pharmacists may not legally substitute a prescription product for a prescribed brand name product unless the substituted drug is a therapeutic equivalent of the prescribed drug, and no such proof have been established.[205]

In the motion for preliminary injunction, Healthpoint argues that the elements of its palming off cause of action are that: (1) Ethex "has marketed Ethezyme ointment to pharmacists and pharmaceutical buyers (2) with the suggestion that Ethezyme ointment can be substituted for Accuzyme ointment." [206] Although Healthpoint relies on *Upjohn Co. v. Schwartz,*[207] a Second Circuit opinion deciding an unfair competition claim under New York law,[208] no Texas case was cited to show that these elements would support a claim of palming off under Texas common law.

Even assuming that Texas courts would recognize the "suggestion of substitution" argument as a theory of recovery under a palming off cause of action, the Texas palming off cause of action pleaded in the second amended complaint [209] alleges that Ethex "has palmed off or induced the palming off of its Ethezyme debridement ointment as a product of Healthpoint." [210]

---

**201.** *E.g., Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.,* 997 F.2d 484, 485–86 (8th Cir.1993) (citations omitted).

**202.** Healthpoint argues there are four forms of palming off: (1) "passing off product A *as* product B;" (2) promoting "one product as a substitute for another product when the former does not have all of the qualities of the later;" (3) promoting "one product as a substitute for another when there are absolutely no scientific grounds for believing the products are equivalent;" and (4) passing off "one's product as a substitute for another when the substitution would be illegal." Docket no. 147 at 3–5.

**203.** Docket no. 89 at 15.

**204.** *Id.*

**205.** *Id.*

**206.** Docket no. 89 at 12. The Court notes that Ethex moved to dismiss *all* of Healthpoint's claims only on the ground that Healthpoint's hands were unclean. In addition, Ethex moved to dismiss because Healthpoint could not demonstrate a *prima facie* cause of action for federal and common law false advertising. Ethex did not challenge the elements of Healthpoint's claims for federal and common law unfair competition or move to dismiss the common law palming off cause of action.

**207.** 246 F.2d 254 (2d Cir.1957).

**208.** *Id.* at 257 & n. 3.

**209.** Docket no. 73 at 30.

**210.** *Id.*

Because Healthpoint's "suggestion of substitution" argument in support of preliminary relief does not correspond to or reiterate the allegations of Texas common law palming off as alleged in its second amended complaint, the Court does not further address whether Healthpoint is entitled to preliminary injunctive relief on its Texas common law palming off cause of action.

At closing argument, in response to a direct inquiry from the Court, Healthpoint indicated that its "palming off" arguments, for purposes of the motion for preliminary injunction, related not only to the cause of action in its second amended complaint captioned "palming off" but also to its Lanham Act and Texas common law unfair competition causes of action. Healthpoint's second amended complaint pleaded causes of action for unfair competition in violation of § 1125(a)(1)(A) and Texas common law [211] by alleging that: (1) the Accuzyme trademark is distinctive; (2) Ethex's use of the Ethezyme trademark is likely to cause confusion as to the origin of Ethezyme; and (3) such use by Ethex "is likely to cause prescribers, pharmacists and healthcare providers to believe that Ethezyme and Accuzyme debridement ointments come from the same source, or that Healthpoint and Defendant are somehow affiliated, connected or associated with one another when in fact they are not." [212] Both the federal and common law causes of action include a "catch all" provision in which preceding paragraphs are "repeated and realleged as if fully set forth herein." [213] The federal unfair competition cause of action also alleges that the allegations in that cause of action "as well as the actions listed in the preceding causes of action constitute unfair competition in violation of the" Lanham Act.[214] Broadly stated, these provisions would incorporate earlier allegations that Ethex's "acts will induce pharmacists and health care providers to wrongfully and improperly substitute defendant's debridement ointment as an alternative for plaintiff's Accuzyme debridement ointment." [215]

Assuming the District Court would agree that these allegations are sufficient to state the "suggestion of substitution" theory of unfair competition proffered as the basis for the request for a preliminary injunction, the Court cannot agree that Healthpoint has satisfied its four-pronged burden of proof to be entitled to a preliminary injunction on the palming off claims. Resolution of the central question relevant to palming off—whether Ethex has impermissibly represented that Ethezyme may be substituted for Accuzyme as an "equivalent" or "generic"—should await the trial on the merits.

### b. false advertising

Both Ethex and Healthpoint move for issuance of a preliminary injunction based on their respective claims of false advertising in violation of § 1125 of the Lanham Act.[216] The parties agree that in order to prove a claim of false advertis-

---

211. For Texas common law unfair competition, Healthpoint realleges the allegations asserted for federal unfair competition. *Id.* at 23–25.

212. *Id.* at 23.

213. Docket no. 73 at 23, ¶ 177 and at 24, ¶ 189.

214. Docket no. 73 at 23, ¶ 183.

215. Docket no. 73 at 14, ¶ 104. *See also, e.g., id.* at 12, ¶ 92 and at 14, ¶ 104.

216. Healthpoint's second amended complaint also pleads a cause of action for false advertising under Texas common law. Healthpoint's briefing does not expressly state whether it is moving for issuance of a preliminary injunction under both the Lanham Act and Texas common law false advertising causes of action. The case which Healthpoint cites as authority for the elements of the false advertising claim, however, is a Lanham Act claim. Therefore, this report is prepared in the understanding that Healthpoint's false advertising claim, for purposes of the instant

ing under the Lanham Act, a party must show the following elements:

(1) a false or misleading statement of fact about a product;

(2) a statement which actually deceived or had the capacity to deceive a substantial segment of potential consumers;

(3) a material deception in that it was likely to influence a consumer's purchasing decision;

(4) the product was in interstate commerce; and

(5) plaintiff had been or was likely to have been injured as a result of the statement in issue.[217]

When the statements of fact at issue are literally false, movant is not required to introduce evidence on the issue of the impact the statements had on consumers; the court will assume the statements actually misled consumers. But, if the statements are misleading, but either ambiguous or literally true, there is no such presumption. When a party seeks only injunctive relief, the party must show that the statements have a tendency to deceive consumers and must produce evidence that the advertisement tends to deceive consumers. When a party seeks to recover money damages for a misleading advertisement that is not literally false, the party must prove actual deception. This requires evidence that a substantial number of consumers were actually mislead by the advertisements.

For the reasons stated below, the Court recommends the issuance of a preliminary injunction to address certain of Healthpoint's false advertising claims.

**c. summary of findings and conclusions on likelihood of success**

At the seven-day hearing, well presented by both sides, five witnesses testified in person for Ethex [218] and five witnesses testified in person for Healthpoint.[219] Numerous exhibits and deposition excerpts were admitted into evidence.[220] The fol-

---

motion, is based on the Lanham. But, if Healthpoint's motion should be considered to be based both on Lanham Act and Texas law false advertising claims, Healthpoint's briefing has failed to demonstrate how the elements of the two causes of action differ such that the analysis should differ.

**217.** Docket no. 29 at 19; docket no. 89 at 12–13. *Pizza Hut. Inc. v. Papa John's Int'l. Inc.*, 227 F.3d 489, 495 (5th Cir.2000); *Seven–Up Co. v. Coca–Cola Co.*, 86 F.3d 1379, 1383 n. 3 (5th Cir.1996); *Taquino v. Teledyne Monarch Rubber*, 893 F.2d 1488, 1500 (5th Cir.1990).

**218.** Dr. Mariani, Dr. Schondelmeyer, Mr. Ross, Dr. Ross and Mr. Locey.

**219.** Dr. Jones, Mr. Jans, Dr. Robertson, Mr. Meyer and Mr. Anderson.

**220.** The declarations and deposition excerpts submitted by Ethex addresses a number of issues, including and not limited to: FDA regulations and the grandfather exception (docket no. 111, exhibit 1; docket nos. 165, 167); testing of Accuzyme and Ethezyme (docket no. 111, exhibit 2; docket no. 168);

comparisons of Accuzyme and Stratus Pharmaceuticals, Inc.'s Kovia (docket no. 111, exhibit 5); sodium metabisulfites (docket no. 111, exhibit 2, docket nos. 161–164, 168); marketing of Ethezyme (docket nos. 161–164; designation of deposition of Phillip Vogt; counter designations of depositions of Christopher Keith and Paul Boersig); USP standards (docket no. 165); Accuzyme's and Ethezyme's legal position on the market (docket no. 165); marketing of Accuzyme (docket no. 166); Accuzyme's competition with Ethezyme and other debriding ointments (docket no. 166, 169); explanation of "generic," formulary, substitution, therapeutic equivalent (docket no. 161–164, 167); closure of Ethex's website promotion of Ethezyme (docket no. 176).

The testimony reflected in declarations and deposition excerpts submitted by Healthpoint addresses a number of issues, including and not limited to: the adverse effects of Ethezyme (docket no. 41, exhibits D, F [sealed]; binder of deposition designations at tabs 2, 4, 8, 9); marketing of Ethezyme for Accuzyme (docket no. 41, exhibit B; deposition designa-

lowing section summaries aspects of the testimony to provide additional findings and conclusions in connection with the cross motions for preliminary injunction.

Dr. Elio Mariani, the first witness for Ethex, testified that when reverse engineering Accuzyme, Ethex or its agents acquired samples of Accuzyme from various lots and did research to analyze its contents and papain activity.[221] Ethex appropriately used the current USP standard, the G lot, when testing for papain activity.[222] Ethex learned that Accuzyme's papain potency varied significantly and were below label claims.[223] Dr. Mariani and others concluded that there was a problem in assuring the stability of papain and decided to add sodium metabisulfite as a stabilizing agent.[224] Dr. Mariani con-

cedes that Ethex must use a warning label because of the addition of sodium metabisulfite,[225] that sodium is not approved for topical uses by the FDA.[226] Once the lawsuit was filed, Ethex learned that Accuzyme's label represented USP units of papain based on the Lot F–3 standard, not the current G standard[227]—the basis of Ethex's false labeling claim along with its claim that Accuzyme impermissibly exceeded the expectation that potency of active ingredients fall within 90 to 110 percent of label claims.

In sum, Ethex reverse engineered Accuzyme using the proper papain standard, but not the one Accuzyme used. Dr Mariani conceded that the potency of papain under the F–3 and G standards are different. As a consequence, Ethezyme has

tions at tabs 1, 2, 4, 5, 8, 9, 12); studies related to Accuzyme (docket no. 41, exhibit E); testing and comparison of Accuzyme, Ethezyme and/or other debriding ointments (docket no. 41, exhibit E, F [sealed]; docket no. 89, exhibit W; binder of deposition designation at tab 6); explanations of "generic," substitution, formulary, therapeutic equivalent, or FDA rules and regulations (binder of deposition designations at tabs 2–4, 8, 9); marketing of Accuzyme (binder of deposition designations at tabs 3, 7, 10); adverse effects of Accuzyme (binder of deposition designation at tab 3); Ethex's financial information (sealed transcript of video deposition of Richard Chibnall).

221. Dr. Mariani testified that Ethex performed one test each on four different tubes coming from four different lots of Accuzyme and, therefore, Ethex's charts of papain percentages (DE 356 and 352) in Accuzyme are actual numbers and are not medians or standard deviations.

222. USP lot F–3 was no longer the USP official standard in November 1996. Ethex ran tests on Accuzyme in 1998, 1999 and 2000. DE 356 and 352.

223. DE 355.

224. There is evidence that the approximately 25% (PE 1) to 32.5% (DE 48) difference be-

tween Lot F–3 and Lot G may account for most of the variations in potency measured by Ethex and its agents in the reverse engineering process.

225. There is evidence that the sodium metabisulfite warning did not appear, for a time, on the Ethezyme product description appearing on Ethex's website or on one of its ads. PE 13 and PE 25. This conduct was in violation of FDA regulations.

226. PE 8. The most recent FDA Inactive Ingredient Guide indicates that the FDA has approved other drug products that contain sodium metabisulfite as an inactive ingredient administered by other than topical means, including injections and opthalmic solutions. Id. And, Ethex argues that other prescription drugs contain sodium metabisulfite, DE 354, and that other approved drugs contain sulfites, DE 367. Therefore, Ethex argues that the addition of sodium metabisulfite as an inactive ingredient to a topical creme should be approved. But, the FDA has the primary jurisdiction to determine if sodium metabisulfite in this case is an "inactive" ingredient and whether its presence in Ethezyme is an approved use.

227. De 351 and DE 380 (the U.S. Pharmacopeia terminated Lot F–3's official status as of November 1996)

never had the same quantity of papain as Accuzyme. Therefore, in each case when Ethex represented that "Ethezyme contains the same active ingredients in the same quantities as Accuzyme"[228] even though those statements may have been made in good faith reliance on the expectation that Healthpoint was following accepted industry practice and referencing its ingredients in terms of current official standards, Ethex made a literally false statement.

Further, if Ethex had tests it considered to be reliable which it used in reverse engineering Accuzyme which indicated that Accuzyme was testing below its label claim of 1.1 USP units of papain, arguably it was always false for Ethex to claim it had "the same active ingredients in the same quantities as Accuzyme." But, in the context of the preliminary injunction proof, the Court is unwilling to exclude Ethex's good faith reliance on the Accuzyme package claim, the industry understanding that measurements refer to current standards and other explanations Ethex may have hypothesized to account for the differences (stability; shelf life).

In the process of reverse engineering Accuzyme, Dr. Mariani testified that Ethex or its agents suspected that Accuzyme did not accurately reverse engineer Panafil White but Dr. Mariani conceded that even when his outside expert told him the predicate produce was Panafil White

and not Accuzyme, he could have purchased more tubes of Panafil White to test its ingredients and even to compare Accuzyme to Panafil White. After a time, Panafil White was no longer available on the market so that Ethex could not have acquired further samples for testing. Dr, Mariani testified Ethex purchased only *one* tube of Panafil White. Ethex presented no evidence that Accuzyme did not match Panafil White. In any event, whether or not Accuzyme is "pharmaceutically equivalent" and "bioequivalent" to Panafil White or Panafil is a determination for the FDA.[229]

Dr Mariani challenged the adequacy of the studies which Healthpoint has performed on Accuzyme,[230] contending that they are not adequate as "safety and efficacy" standards for an NDA. Healthpoint's own expert, Mr. Meyer, agreed, though opined that they may be adequate for an ANDA review. In any event. Ethezyme bases it lawfulness on Accuzyme and, therefore, is not claiming that Accuzyme is unsafe since to prevail on such an argument would appear to affect Ethex's ability to continue to make its lawfulness argument. Dr. Mariani testified that Ethex has done testing of its product on human, nonhuman or nonviable tissue. Indeed, Dr. Mariani testified that Ethex spent about $5,800 in developing Ethezyme for Accuzyme,[231] a product for which Health-

228. *E.g.*, PE 25; DE 377.

229. Panafil White's label lists its Papain as not less than 525,700 USP units of papain per gram. PE 10. Ethex presented no evidence that any of its tests of Accuzyme showed less than 525,700 units of papain. DE 355 (Ethex tests showed 627,000 units, 660,000 units and 686,000 units of papain).

Again, it appears appropriate to note at this juncture that Ethex's continuing objection to Healthpoint introducing into evidence, for example, the correlation between Lot F and Lot

G USP standards (PE 1), or the portion of Dr. Hobson's declaration that states that even though the USP references changed, Healthpoint's formula for Accuzyme never changed because Ethex was not allowed discovery on the Accuzyme formula, assays, methodology and manufacturing methods is mis-placed. The FDA, not the District Court, will determine if Accuzyme is lawfully on the market as a derivative of Panafil or Panafil White.

230. DE 363, 364, 365, 366 and 21.

231. PE 4 at 3.

point spends approximately $4.8 million in marketing.

Dr Mariani was not aware of any complaint about Ethezyme at the Brookhaven Hospital[232] Dr. Mariani could not say whether the experience at Brookhaven Hospital was related to the presence of sodium metabisulfite or the greater potency of papain than in Accuzyme.

Dr. Mariani, a licensed pharmacist, testified that substitution of drugs by a pharmacist is governed by state law. Dr. Mariani admitted that $8.3 \times 10^5$ USP units of papain activity does not equal $1.1 \times 10^6$ USP units of papain activity and, therefore, it would appear he would be required to say that Ethezyme and Accuzyme are not "pharmaceutical equivalents" as defined in the Orange Book because they do not contain the same active ingredients in the same amounts but that they could be considered to be "pharmaceutical alternatives" because they contain the same ingredients but in different amounts. Dr. Mariani knows of no tests that establish that the active ingredients of Ethezyme and Accuzyme become available at the same rate and extent and, therefore, that cannot say they are "bioequivalent."

Dr. Stephen Schondelmeyer, a witness for Ethex, also testified that substitution is governed by state law. Although the FDA requires therapeutic equivalence for listing in the Orange Book,[233] Dr. Schondelmeyer testified that substitution is left up to the professional judgment of the physician and the pharmacist in specific instances. The Orange Book only lists therapeutic equivalent determinations that have been made by the FDA. Therefore, other drugs not approved by the FDA may be therapeutically equivalent, although Dr. Schondelmeyer emphasized that therapeutic equiva-

lence is a scientific determination. Dr. Schondelmeyer was not aware if the FDA had defined "generic," but in Dr. Schondelmeyer's opinion, one should avoid the use of the word "generic" because it is imprecise and the use of the word "alternative" does not necessarily imply therapeutic equivalence. Dr. Schondelmeyer agreed that Accuzyme and Ethezyme cannot be considered to be pharmaceutical equivalents if one has $8.3 \times 10^5$ USP units of papain activity and the other has $1.1 \times 10^6$ USP units of papain activity and that it would be deceptive to say that the two products have the same active ingredients in the same amounts.

With respect to hospital formularies, Dr. Schondelmeyer testified that hospital committees set up drug use policies in which it agreed that hospital pharmacists automatically will substitute one drug from another, without calling the physician first, if the substitution is listed on the formulary. Doctors with privileges are expected to know these substitutions "on formulary" will occur automatically and are expected to write "fill only as directed" prescriptions with appropriate back-up if they do not agree to substitution. Dr. Schondelmeyer testified that perhaps three-quarters of all wound debridement products are used at hospitals or long term care facilities including nursing homes. Dr. Schondelmeyer, who has been a consultant for the State of Kentucky formulary board, testified that under Kentucky law, pharmacists may substitute only therapeutically equivalent drugs.[234]

Mr. David Rosen, an attorney and licensed pharmacist, a witness for Ethex, testified as to drug substitution practices. In sum, some states are "Orange Book"

---

**232.** PE 7 ("extremely unhappy" with Ethezyme; in some cases the wound became "worse").

**233.** PE 9.

**234.** PE 16 and 17.

states such that an FDA finding of therapeutic equivalence is required. Other states are "positive formulary" states such that a pharmacist may substitute without getting the prior approval of the physician if the drug is listed in the Orange Book or on the state's formulary. Others are "negative formulary" states such that the pharmacist may substitute any drug for another drug so long as the drug does not contain an ingredient on the formulary. Other states are "professional judgment" states in which the pharmacist may make substitution decisions based on the Orange Book, package inserts and similar information and typically attempt to ascertain if the drug is pharmaceutically equivalent and bioequivalent before substituting. If a pharmacist makes an illegal substitution, action could be taken against his license.

Mr. Rosen testified that products are often referred to as "generics" even though they have not gone through the FDA approval process and, to his mind, "generic"does not imply a representation of therapeutic equivalence. Mr. Rosen testified that, in his opinion, "generic" merely means there is an alternative to a brand name product, but does not suggest therapeutic equivalence and, if there is no rating listed, as in Ethezyme's ad, there is no representation of therapeutic equivalence. Mr. Rosen further testified that there is a "more expansive" definition of "generic" for drugs that have not gone through the FDA approval process. If there is an express claim of "bioequivalence," the drug must demonstrate bioequivalence. Mr. Rosen agreed that the FDA took the position in *Solvay* that even exempt generic drugs need to show therapeutic equivalence but he disagrees with the view.

Mr. Rosen referred various website ads that show a "generic" drug as being compared to other products, such as the Alpharma website that advertises one of its product in "reference" to a brand name,[235] or Amide Pharmaceutical, Inc's website that lists its products "compared to" brand name products,[236] or Geneva's webpage that lists "innovator's brand name" and "generic name" products[237] or Teva Pharmaceuticals' website that lists "brand name" products in reference to a Teva product and a "TEE" code which lists the therapeutic equivalence rating[238] and the URL webpage that lists a URL product in connection with "reference brand" and provides a rating code or "NR" to indicate the product is not rated.[239] Mr. Rosen testified these ads show the common industry practice of comparing reference brands to generic products.

Mr. Rosen distinguished the FDA policy on advertising generic drugs which requires that claims a product is "comparable or superior" to a competing product be supported by "substantial evidence or substantial clinical experience"[240] on the grounds that the policy is non-binding and applies only to drugs which have gone through the formal NDA or ANDA process and not grandfathered drugs. But, Mr. Rosen provided no explanation as to why there would be a more rigorous standard for drugs that had been reviewed and approved and those not subject to any review or approval. Rosen testified that he would believe that 1.1 is a safe level of papain based solely on the label claim on Ethezyme, but that he knows of no tests or clinical trials that establish it.

**235.** DE 382.

**236.** DE 384.

**237.** DE384.

**238.** DE 385.

**239.** DE 386.

**240.** PE 18 at A–109.

Mr. Rosen testified that both Accuzyme and Ethezyme claim to be grandfathered from the new drug requirements because they claim to be "the same as" Panafil White, but is aware of no research that Ethex performed on Panafil White. Mr. Rosen understands that other drugs with enzymes have potency ranges of 90 to 165 percent of label or 80 to 125 percent of label.[241] Mr. Rosen testified that a false advertising issue is raised by the fact that Ethex knew by its own testing that Ethezyme had more potent papain than Accuzyme,[242] that Ethex mass mailed letters to consumers in January, 2001 claiming that Accuzyme contains 25 percent less papain than its label and claiming that Ethezyme is the "new standard" of papain activity,[243] yet Ethezyme advertises that it has "the same active ingredients in the same quantities as Accuzyme," [244] although Mr. Rosen was willing to say that because the Accuzyme still represented that it had 1.1 USP units of papain Ethezyme's conflicting representations might be excusable because it might relate to differences in the manufacturing process. In Mr. Rosen's opinion, Ethex might believe Ethezyme is the "new standard" because it does not lose potency over time, for example, not because Accuzyme's label is being revised downward 25 percent.

Dr. Ivan Ross, testified for Ethex, concerning a survey he prepared to test whether or not individuals who read Healthpoint's September 26, 2000 letter were mislead. This letter, directed to pharmacists and others who make drug substitution decisions or recommendations, among other things, stated that (1) under federal law manufacturers must seek approval to market a generic drug by submitting data to show that one drug is therapeutically equivalent to the other by Healthpoint was not aware that any drug has submitted data to the FDA to demonstrate therapeutic equivalence to Accuzyme; (2) one of the products contains a sodium metabisulfite warning; and (3) no product has a randomized comparative clinical research study showing the efficacy of the product but that Healthpoint would send a copy of a published study on Accuzyme. Ethex has not established that any of those three statements are not literally true.

Ethex commissioned Dr. Ross to conduct a study to determine if the letter created the false impressions about Accuzyme or its un-named competitors. Dr. Ross conducted a survey of individuals in 16 markets, including San Antonio, of approximately 120 persons who identified themselves as being "involved in selecting wound care products" for hospitals, hospices, and nursing homes randomly selected from the Yellow Pages. Dr. Ross was testing for four propositions of those who had been presented with the September 26, 2000 letter: [245] (1) Accuzyme is FDA approved; (2) others are not approved

**241.** PE 22. *See also* PE 39.

**242.** Dr. Mariani's testimony.

**243.** PE 2 and PE 3.

**244.** PE 25 (August, 2000) and DE 377 (April, 2000). Healthpoint withdrew as an exhibit a third ad, published in December 2000, because Healthpoint was not able to locate the original magazine so that Ethex could verify that it had been photocopied accurately. Ethex did not challenge the accuracy of the copy except to the extent that its inability to inspect the original magazine deprived it of the opportunity to see if the sodium metabisulfite ad appeared on an adjacent page.

**245.** Dr. Ross's testimony and written report (DE 388) describe in greater detail the scope of his survey and the methods by which it was administered (for example, when the respondent was shown the letter or was able to refer to the letter in answering). Dr. Ross also testified that certain of the 120 respondents were disqualified and why.

and need to be; (3) all drugs needed approval; (4) Accuzyme is better than its competitors. After being presented with Healthpoint's September 26, 2000 letter, (1) approximately 24 percent perceived that Accuzyme was approved by the FDA/government; (2) approximately 34 percent perceived that other drugs are not approved by the FDA/government and need to be; (3) approximately 34 percent thought FDA/government approval was required of all wound debriding ointments of this type; and (4) approximately 3 percent thought that Accuzyme is superior to the other products.[246]

It is not known the exact occupations of the respondents, whether any of the respondents are actually involved in making drug substitution decisions or recommendations ("wound category products" not limited to pharmacists and is a broad enough category to include beds, equipment and bandages as well as drugs), whether any respondent was otherwise familiar with Accuzyme or Healthpoint or any other wound care debriding product referenced in the letter, or whether any respondent in fact had received or read a copy of the September 26, 2000 letter from Healthpoint prior to participating in the survey.[247] Although Dr. Ross did not present this information, it would be possible to determine how many respondents were physicians and how many were not since all respondents were paid, but doctors were paid $100 to participate in the survey and non-physicians were paid $75. The survey did not ask any specific questions about the presence of sodium metabisulfite.

Dr. Ross explained that the process of coding responses was subjective. For example, one respondent's answers were not counted because the respondent incorrectly answered the control question, which asked if the letter communicated anything about differences in the ease of application in the products. Respondent 204 answered "yes," disqualifying that respondent because the letter did not address ease of application. But, in the follow-up question, the respondent indicated that "one of the chemicals in the generic has to have a warning on it due to allergic reactions," thus raising the possibility that respondent 204 thought that the limitations on which patients could be treated with Ethezyme due to concerns about patients who may have an allergic reaction to sulfites related to the "ease" with which Ethezyme could be used. Another coder, might not have disqualified this respondent. Relatedly, if one were to assume that Accuzyme is legally on the market and Ethezyme needs FDA approval to market itself as a "generic," it is not known how many of the 34 percent who thought other drugs are not approved by the FDA and need to be were thinking that they needed approval as "generics," a word used in the letter.

Dr. Kim Robertson later testified for Healthpoint that the study is of limited utility. Dr. Roberston found it to be a "major problem" that he did not know the occupations, education and training of those who participated in the survey. Further, the respondents who might agree that they are involved in selecting wound care products, allowing them to participate in the paid survey, might not be involved in making or recommending drug substitutions in accordance with state law. There is no way to know if the respondents had any training in determining whether one drug may be substituted for another drug.

---

246. DE 388.

247. Dr. Ross testified that he asked Ethex for the mailing list for Healthpoint's September 26, 2000 letter nut did not receive it from Ethex.

Additionally, Dr. Robertson testified that he did not understand why a "yes" answer to the control question, question 5, would necessarily imply that the respondent was guessing and should be disqualified. Dr. Robertson testified that if questions 4, 6 and 7—questions he found problematic—were eliminated from the survey, the reliability of the survey would be increased but the survey's deception rates would be significantly affected. Dr. Robertson disagreed with certain coding decisions, as reflected in the record. Further, Dr. Robertson said that the method of presenting the survey—allowing the respondent to read the September 26, 2000 letter, then taking the letter away and asking several questions about the reader's understanding/recollection of the letter before allowing the respondent to refer to the letter again in responding—was artificial and did not accurately account for well recognized tests that show a normal 20 to 30 percent error rate in tests of recollection. To his view, none of the results of deception measured by Ethex's survey were at a significant level if one applied the 20 to 30 percent natural error rate in perception and other issues.

Mr. J.R. Locey, a Healthpoint sales manager, the last live witness for Ethex, testified about Healthpoint's so-called "Operation Knock Out," a plan to create "doubt" in the market about automatically substituting another product for Accuzyme and to create awareness in the market of the attributes of Accuzyme. Mr. Locey did not know that Accuzyme was on the market based on Panafil White but did know that Accuzyme was not the subject of an NDA or ANDA, did not know that Accuzyme was marketed based on Panafil White, did know that Accuzyme was not "ab" rated to Panafil White (a rating that would indicate the FDA had approved the drugs for substitution as "therapeutic

equivalents") and had no information that Accuzyme was therapeutically equivalent to Panafil White. Mr. Locey testified that he understood that Accuzyme was on the market as a grandfathered pre–1962 prescription drug. Mr. Locey acknowledged that an internal Healthpoint document refers to Ethezyme as an "alternative" to Accuzyme. To his mind, "generic" is a word that denotes the drug may be substituted.

Mr. Locey testified about a variety of documents—some of which were mailed, others of which were disseminated to the sales force to use in discussion Accuzyme and its competitors, and others of which were drafts or otherwise internal documents with no proof of further dissemination. Mr. Locey testified that one letter sent by sales representative Erin O'Halloren to a hospital in Denver on February 2, 2001 refers to Accuzyme as the "only other FDA approved enzymatic debrider currently available," [248] a phrase that Mr. Locey agreed implied that Accuzyme was FDA approved. Mr. Locey testified that when he learned of the letter he reminded Ms. O'Holleran of the need to get approval from the regulatory section in Healthpoint before sending out any letters that refer to Accuzyme's status before the FDA.

Mr Locey testified that Healthpoint employs a sales force of approximately 83 individuals and expects each sales person to visit three hospitals to promote Healthpoint products every day. The budget for marketing at Healthpoint is approximately $4.8 million a year in 2001. Healthpoint distributed approximately 200,000 sample tubes to physicians in 200. The sales of Accuzyme have risen from $1.2 million in 1996 to $17.8 million in 2000. Mr. Locey attributes this sales growth to increased brand awareness due to the support provided by the sales staff. Mr. Locey testified that Healthpoint wants to discourage

248. DE 393.

substitutions because no other product has been determined to the pharmaceutically equivalent or bioequivalent to Accuzyme and no other product has demonstrated clinical outcomes. Mr. Locey testified that to his knowledge the formula for Accuzyme has not changed since the product was introduced in 1996.

Mr. Locey testified that Accuzyme under its new label, reflecting $8.3 \times 10^5$ USP units of papain activity was in distribution as of March 26, 2001. No Accuzyme under the 1.1 label was being distributed as of that point.

Dr. Trenton Jones testified for Healthpoint that he has prescribed Accuzyme and that one occasion a patient of his used Ethezyme instead of Accuzyme and that the wound worsened.[249] Dr. Jones testified that he now requires his prescriptions for Accuzyme to be filled as written and without substitution.[250]

Mr. Eugene Jans, a pharmacist at the Nix Hospital, San Antonio, Texas, called by Healthpoint, testified that he has substituted Ethezyme for Accuzyme, basing his decision to substitute on the information on the labels of the two products, information on the pharmaceutical supplier Bergen Brunswig's database available to him, promotional information received from Ethex, and at least one advertisement Ethex placed in the U.S. Pharmacist magazine which advertised Ethezyme as an "alternative" to Accuzyme. When Mr. Jans saw the word "alternative" he thought that Ethezyme could be substituted for Accuzyme and that Ethezyme was "generic" to Accuzyme. Mr. Jans testified that before he substituted he knew Ethezyme was not "ab" rated, did not know if Ethezyme and Accuzyme were listed in the Orange Book or on the hospital's formulary, but thought they could be substituted, without contacting the physician, even if they were not in the Orange Book. At the time of his testimony, Mr. Jans knew that Ethezyme was not in the Nix formulary and is not therapeutically equivalent to Accuzyme and, for those reasons, now believed that, under Texas law, Ethezyme may not be substituted for Accuzyme.

Mr. Gerald Meyer, a former acting director of the FDA and director of CDER with approximately 40 years experience in FDA issues, called by Healthpoint, testified that, in his opinion, Accuzyme is legally on the market. Accuzyme's two active ingredients, papain and urea, were on the market before 1962 and perhaps before 1938[251] and, therefore, Accuzyme would be on the market as a duplicate of a pre–1962 prescription drug[252] or because it is made

249. Dr. Jones is a plastic surgeon who practices in Missouri. Dr. Jones testified that under Missouri law, a prescription has two blanks for the doctor's signature, one that indicates the doctor approves substitution and another that tells the pharmacist to fill as written without substitution.

250. Dr. Jones also testified that he had never prescribed Accuzyme based upon its papain activity—whether $8.3 \times 10^5$ USP units or $1.1 \times 10^6$ USP units—and does not know if efficacy is tied to papain levels.

251. Mr. Meyer testified that he knows the FDA has taken the position that if a pre–1938 product has been changed in any way, it is

not grandfathered under the 1938 law and must be approved by the FDA, but the United States Supreme Court has not addressed the issue and, therefore, reliance on a pre–1938 exemption, at least in the case of papain/urea debridement compounds, remains a credible argument. More specifically, Mr. Meyer testified that it could be argued that papain and urea may have been used before 1938. Mr. Meyer testified that "DESI 2" is a term given to me-too copies of pre–1938 drugs as a term of convenience to describe products on the market between 1938 and 1962.

252. Mr. Meyer testified that he has been told that Panafil and Panafil White were both on the market before 1962 in the same of substantially the same formula as Accuzyme.

up of products that are GRAS/E.[253] As such, Accuzyme "enjoys and undetermined status" and is allowed to be on the market until such time as the FDA may determine a NDA or ANDA needs to be submitted. Healthpoint was required to register with the FDA, to submit a list of its products annually and to keep records of adverse reactions about their product.

Mr. Meyer also testified that although Accuzyme was marketed under an inaccurate label and misbranded and that the FDA might order corrective action, he found that the misbranding in this case—a result of the USP reference standard changing—was unprecedented and would also be taken into consideration along with its determination of whether Healthpoint has taken corrective action to notify the consumer and to prevent a recurrence of the problem. Although Mr. Meyer was careful to defer to the FDA and its determination of what action should be taken, if any, because there is no evidence of risk to patients, he doubted that the FDA would determine that the product ever was unsafe. Mr. Meyer testified that the accepted potency range of 90 to 110 percent from label did not appear to have real value for enzymes which might better be expressed in terms of "not lower than" a stated level. Mr. Meyer also understood that enzymes such as papain might be particularly difficult to measure.

Mr. Meyer is not aware of the FDA ever having taken a position different from the one they took in *Solvay*, namely, that there needs to be one definition of "generic"—the FDA's definition. Mr. Meyer testified that if Ethex knew that its tests

were showing more papain in Ethezyme than Accuzyme, it would be false of Ethex to say Ethezyme had the same active ingredients in the same amounts. In his opinion, the claim that Ethezyme is the "new standard" in reference to Accuzyme is a claim of superiority that needs to be supported by data. Mr. Meyer testified that he has learned of Healthpoint's safety and effectiveness studies of Accuzyme and while the studies would not be sufficient for a NDA, the FDA might consider them adequate for an ANDA.

Mr. Larry Anderson, a DPT Laboratories' chemist, testified that there has been no change in the Accuzyme formula over time; that Lot F–3 was the current standard and was used to reverse engineer Panafil White to create Accuzyme; that he first learned that Lot F3 had been discontinued as the official reference standard in June 2000 when he happened upon the information on the USP website;[254] that prior to that time he thought Lot F–3 and Lot G were both being used as standards; when he called the supplier of papain to Healthpoint, EDC, the person with whom he spoke indicated that they had not known Lot F–3 had been discontinued.

### d. recommended preliminary relief

■ Healthpoint is likely to prevail on is claim that certain representations made by Ethex, as noted below, constitute false advertising under the Lanham Act and Texas law. Because Healthpoint has demonstrated irreparable harm that the threatened injury outweighs any damage to Ethex and that the injunction recommended below will not disserve the public,

253. DE 381.

254. PE 1 dated October 7, 1996 indicates that USP would switch from Lot F–3 to G but not that F–3 was discontinued for further use. Mr. Anderson was shown DE 414 dated June 26, 1997 (not admitted) and indicated that he

had never seen the document before but affirmed that he had discussed converting their unit of measurement for papain from USP to "DPT" units to avoid the problems in the change in USP standards but affirmed that at the time he still thought Lot F–3 was acceptable.

it is recommended that the District Court issue a preliminary injunction against Ethex and in favor of Healthpoint in three areas:

(a) to enjoin from Ethex and its agents from advertising Ethezyme from saying that "Ethezyme contains the same active ingredients in the same quantities as Accuzyme."[255] Healthpoint has demonstrated a likelihood of demonstrating that this statement is literally false. It is undisputed that Accuzyme being placed on the market today contains $8.3 \times 10^5$ USP units of papain activity as measured by USP lot G whereas Ethezyme contains $1.1 \times 10^6$ USP units of papain activity as measured by USP lot G and that previously manufactured tubes of Accuzyme contain $1.1 \times 10^6$ USP units of papain activity as measure by USP lot F which, through the vagaries of measuring this enzyme, is not the same papain activity. In closing statement, Ethex's counsel stated that there was no evidence in the preliminary injunction hearing that Ethex had represented that Ethezyme has the same active ingredients in the same quantities after being informed that Ethezyme did not have the same amounts of papain as Accuzyme (in approximately January 2001). If Ethex has no intention of continuing to make that representation, it is not harmed by this aspect of the preliminary injunction.

█ (b) to enjoin Ethex from including in further print advertisements in which Ethezyme is compared to Accuzyme, that,

as written in prior advertisements, "neither brand nor generic papain-urea compounds are subject to FDA approval or rating." Although Dr. Mariani and others testified for Ethex that there are "generic alternatives" that do not need to be approved by the FDA and although Dr. Schondelmeyer and Mr. Rosen testified that "generic" may be used without confusion with respect to drugs that are similar but not necessarily therapeutically equivalent, "generic" has been defined by the FDA.[256] And, as discussed, the FDA has an interest in insuring that only one definition of FDA terms of art, such as "therapeutically equivalent" and "generic," is used in the context of drug approval, acceptance and use.[257] Under the FDA's definition, Ethezyme is not a "generic" equivalent to Accuzyme because it has not been the subject of an ANDA and has not presented sufficient evidence of "therapeutic equivalence," "pharmaceutical equivivalence" or "bioequivalence." In the context of the other representations, it is misleading for Ethezyme to state in his printed ads that "[n]either brand nor generic papain debriding compounds are subject to FDA approval or rating"[258] when, it also is claiming to be an "alternative" to Accuzyme. It is misleading (and internally inconsistent) to state that papain-urea debriding ointments are not subject to FDA approval or rating and to imply that Ethezyme is a "generic" equivalent to Accuzyme when the FDA has not made that determination and when Ethex has not demonstrated that Ethezyme is bioequivalent and therapeutically equivalent to Accuzyme.[259] The over-all effect is to create

---

255. PE 25; DE 377.

256. PE 19 and 20.

257. PE 19 (FDA amicus brief in *Solvay* ).

258. PE 25; DE 377 (emphasis added).

259. As established in *Summit II,* failure to disclose FDA non-approval is not actionable (because that would require interpretation of FDA regulations) but, as established in *Mylan*

*Labs.,* misleadingly inferring FDA approval is actionable because the truth of the claim can be established as a matter or fact. Although it is true that these papain-urea debriding ointments have been marketed without FDA pre-approval unless and until the FDA affirmatively indicates otherwise under CPG 7132c.02, the wording of Ethezyme's disclaimer suggests that Ethezyme is a "generic," a conclusion that has not been demonstrated as a matter of fact.

the misleading impression that Accuzyme is the "brand" and Ethezyme is a "generic" substitute for Accuzyme. when it has not been determined that Ethezyme is a "generic" alternative to Accuzyme. Healthpoint has established that it is likely to succeed in showing that even sophisticated consumers such as pharmacists incorrectly concluded Ethezyme is a "generic" and may be substituted [260] even though the substitution may not be lawful under state law.[261]

■ (c) to enjoin Ethex from stating that Ethezyme is the "new standard of potency in papain/urea debriding ointments." This is an implicit claim of superiority. Even if Ethezyme had been approved as a "generic" substitute for Accuzyme by the FDA and had demonstrated its bioequivalence and therapeutic equivalence, FDA policy would not allow Ethezyme to advertise itself as "better" or "more effective" than Accuzyme.[262]

Healthpoint has demonstrated a likelihood of establishing that Ethex has insufficient support for claiming that Ethezyme is superior to a product that it duplicated in order be marketed legally.

In each of the three areas noted above, Healthpoint has demonstrated a likelihood of success on the merits on its false advertising claim, in general, and on demonstrating falsity/misleading statements and tendency to deceive, in specific. "When injunctive relief is sought under the Lanham Act, the finding of a tendency to deceive satisfies the requisite showing of irreparable harm." [263] In any event, with respect to the three areas noted above, Healthpoint demonstrated irreparable harm; [264] irreparable injury that could not adequately be compensated for through an award of money damages; [265] and that the injunction would not disserve the public interest. Indeed, the tailored scope of this injunctive relief, in essence, "freezes the

---

**260.** 3 McCarthy § 27:55 at 27–81 ("However, on a motion for preliminary injunction, a survey is not always necessary and it is sufficient if plaintiff introduces expert testimony or any other evidence that a significant number of consumers received the claimed message from the advertisement."). *See* Healthpoint's counter-designation of deposition testimony of Cheri Carter at 83f ("When I hear 'alternate' or 'equivalent' I assume that the product can be substituted.").

**261.** The District Court might wish to consider requiring Ethex to include in advertisements an alternative statement that "Accuzyme and Ethezyme are not subject to FDA pre-approval or rating. Substitution of Ethezyme for Accuzyme may violate state law." It is recommended that the District Court defer any directives on advertisements await a trial on the merits.

**262.** *Cf.* 45 Fed.Reg. at 72585 ("FDA's determination of therapeutic equivalence is not a judgment as to which manufacturer's product is 'better' or 'more effective.' ").

**263.** *United Indus. Corp. v. Clorox,* 140 F.3d 1175, 1183 (8th Cir.1998) (citing *Black Hills*

*Jewelry Mfg. Co. v. Gold Rush, Inc.,* 633 F.2d 746, 753 n. 7 (8th Cir.1980) ("To obtain an injunction under section 43(a) appellees need only show that the falsities complained of had a tendency to deceive."); *McNeilab, Inc. v. American Home Prods. Corp.,* 848 F.2d 34, 38 (2d Cir.1988) (where challenged advertisement directly, but falsely, proclaims superiority of defendant's product over plaintiff's, irreparable harm may be presumed)).

**264.** Healthpoint has demonstrated a likelihood of establishing that Ethezyme has been substituted for Accuzyme by pharmacists. *Johnson & Johnson v. Carter–Wallace, Inc.,* 631 F.2d 186, 192 (2d Cir.1980) ("While proof of actual diversion of sales is not required for a § 43(a) injunction to issue, proof that the advertising complained of is in fact false is essential.").

**265.** *DFW Metro Line Servs. v. Southwestern Bell Tel. Co.,* 901 F.2d 1267, 1269 (5th Cir. 1990) (when money damages would adequately compensate, a showing of irreparable harm is precluded).

*status quo* and is intended 'to preserve the relative positions of the parties until a trial on the merits can be held.' " [266]

■ Neither side has demonstrated a likelihood of succeeding on its other preliminary injunction claims sufficient to justify preliminary relief.[267] Based on the current record and the First Amendment, it is not appropriate to enter a preliminary injunction to prevent Ethex from mentioning Accuzyme in its advertisements of Ethezyme or from making any comparisons of Ethezyme to Accuzyme, so long as Ethex has support for any statements it makes and the statements are not misleading.[268]

Ethex has not demonstrated a likelihood of succeeding on its requests that Healthpoint be enjoined from making any statements about Ethezyme in marketing Accuzyme (there is no evidence that Healthpoint has placed or intends to place comparative print advertisements but Healthpoint salespersons compare Accuzyme and Ethezyme in marketing Accuzyme). Again, so long as the statements it makes are not misleading have factual support, a preliminary injunction does not appear to be appropriate. Ethex specifically has not demonstrated a likelihood of

success on the merits of its other claims, including its claims that Healthpoint has falsely represented that Accuzyme need not be kept in a "cool place," [269] and that Healthpoint has falsely implied that it has research that shows Accuzyme is more effective than Ethezyme.[270] Alternatively, if Ethex has demonstrated a likelihood of success, it has not demonstrated irreparable harm if preliminary relief does not issue.

■ Whether the parties have proven their other claims of misstatements in support of their respective false advertising cause of actions (and, with respect to Healthpoint, its palming off cause of action) to be entitled to relief should await the full trial on the merits. Although movant need not prove his case in a preliminary injunction context, a motion for preliminary injunction should be denied when a court is required to resolve complex questions of fact and law and/or where money damages would adequately compensate a movant. Also to be deferred to the decision on merits are the parties' competing requests that its competitor be required to engage in corrective advertising.[271] "The burden on the party seeking a preliminary injunction is especially heavy

---

**266.** *Wenner,* 123 F.3d at 326 (*quoting Univ. of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981)).

**267.** *See* text accompanying notes 120–25.

**268.** *Hypertherm, Inc. v. Precision Prods., Inc.,* 832 F.2d 697, 700 (1st Cir.1987) ("In the entrepreneurial world, as elsewhere, copycats have always been common place. Given these verities, it follows logically that a firm, like PPI, which has labored (lawfully) to replicate another's parts may ordinarily use the trademark descriptively, that is, to identify the product it has copied, so long as no misrepresentation is made and no confusion is generated as to the source, sponsorship or identity of the ersatz goods."); *G.D. Searle & Co. v. Hudson Pharm. Corp.,* 715 F.2d 837, 843 (3rd Cir.1983) ("In short, whether one is entitled to refer to a competitor's trademark depends not on where the reference appears but on whether the reference is truthful.").

**269.** Ethex's counsel specifically mentioned this argument in closing statement and, therefore, it is specifically addressed here. Ethex has cited the Silver deposition as support for its arguments (docket no. 161), but Ms. Silver testified that Ethezyme's package insert which states "store in a cool place between 8 degrees and 15 degrees centigrade or 46 degrees Fahrenheit to 59 degrees Fahrenheit" means "the same" as Accuzyme's label which state states "store in a cool place" (docket no. 166 at 59–60 and 32–33).

**270.** Again, whether Ethex is required to test Ethezyme is a matter for the FDA.

**271.** A District Court has broad power in equity to take affirmative steps to eliminate possible consumer confusion. *Bunn Co. v. AAA Replacement Parts Co.,* 451 F.2d 1254, 1269–70 (5th Cir.1971).

when the relief sought would in effect grant plaintiff a substantial part of the relief it would obtain after a trial on the merits." [272]  Deferring corrective advertising until the decision on the merits avoids the unnecessarily harsh and possibly confusing possibility of multiple corrective advertisements. [273]

### 2. *Irreparable Injury*

■■■ With respect to the recommended preliminary injunction, the findings as to tendency to deceive satisfy the requisite showing of irreparable harm as to the false claim that Ethezyme has the same active ingredients in the same amount as Accuzyme, the misleading impression that Ethezyme may be a "generic" drug as determined by the FDA, and the undemonstrated claim of Ethezyme's superiority over Accuzyme. [274]

■■■ With respect to the preliminary injunctive relief requested but not ordered, the Court had determined that neither side has demonstrated likelihood of success and determines that neither side has demonstrated irreparable injury. Both sides argue that if a preliminary injunction does not issue, they will lose good will, suffer damage to reputation, will lose customers and suffer damages. Injuries adequately remedied by monetary damages are not irreparable. [275] Assertions of injuries not supported by evidence fail to establish clearly irreparable harm. [276] In light of the determination that likelihood of success has not been demonstrated for purposes of a preliminary injunction, the alleged harm each side would suffer is more speculative and, on balance, does not serve to tip the balance of equities in either side's favor. [277]

Although Ethex has shown that one Healthpoint salesperson mailed a letter dated February 2, 2001 which falsely implied that Accuzyme had FDA approval and that Ethezyme needed to be "AB" rated, [278] Mr. Locey, a Healthpoint marketing manager, testified this letter never should have been mailed without approval from "regulatory," thus indicating Healthpoint has an internal review procedure in place to prevent a reoccurrence, and that the Denver area hospital which received the letter still uses Ethezyme such that the letter had no effect. Therefore, Ethex has not demonstrated irreparable harm if a preliminary injunction does not issue.

### 3. *Balancing*

■■ Both sides argue that the costs to be incurred if its respective preliminary

---

272. *GTE Corp.*, 731 F.2d at 678.

273. For example, if the District Court enters the recommended preliminary relief, then it will need to consider whether, after trial on the merits, Ethex should be required to correct its literally false representations that Ethezyme "contains the same active ingredients in the same quantities as Acccuzyme." Although Ethex has argued that the false claim was made innocently, because Ethex assumed Accuzyme's label expressed ingredients in the current USP standard, there is evidence that Ethex's tests of Accuzyme showed that Accuzyme was testing for papain at a lower level. After learning that its internal tests most likely were reflecting a difference in USP standards, Ethex mass mailed two letters claiming that Accuzyme had "potency problems," that Ethezyme was "the new standard of potency," and that Accuzyme had been "misbranded" because of the USP lot discrepancy (the FDA may so decide, but the FDA had not so determined at the time of the letters).

274. *McNeilab, Inc. v. American Home Prods. Corp.*, 848 F.2d at 38.

275. *DFW Metro Line Servs.*, 901 F.2d at 1269.

276. *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir.1985).

277. *United Indus. Corp. v. The Clorox Co.*, 140 F.3d at 1184.

278. DE 393 at 1; *see also* testimony of J.R. Locey.

injunction is ordered is outweighed by the harm if its preliminary injunction does not issue.

With respect to the preliminary injunctive relief ordered, the costs to Ethezyme of making changes to its advertisements is relatively minor. With respect to the preliminary injunctive relief requested but not ordered, the Court determines that, based on the current showing of likelihood of success on the merits, the balance of the equities, based on the current record, is not tipped in favor of further preliminary injunctive relief.[279]

### 4. *Public Interest*

■ The public interest is served by accurate drug advertisements. Therefore, the public interest is served by the preliminary relief recommended. On the other hand, absent a more substantial showing of claims, neither Ethex nor Healthpoint have shown that denying injunctive relief, as recommended herein, will disserve the public interest on the current record.

## VI. *RECOMMENDATION*

The undersigned recommends that: Ethex's motion for a preliminary injunction[280] be *denied;* Healthpoint's cross motion for preliminary injunction[281] be *granted in part and denied in part;* Ethex's motion to dismiss[282] be *denied;* Ethex's alternative motion to dismiss or for stay[283] be *denied;* and Healthpoint's motion to dismiss Ethex's claim of misbranding and its unclean hands claims or defenses[284] be *granted.* As discussed

above, those issues that require the direct application or interpretation of the FDCA, implementing regulations or FDA policies[285] should be *dismissed,* but, at this stage of the proceeding, claims that appear able to be resolved without the direct application or interpretation of the FDCA, implementing regulations or FDA policies[286] should be allowed to proceed.

The Court concludes that the instant Order need not be sealed indefinitely because the confidential information herein has been referred to in unsealed court proceedings and/or because the Court considers such references to be necessary for proper documentation of the findings and conclusions. Nevertheless, this Order shall be temporarily sealed only for seven (7) days following filing so that the parties may have the opportunity to address redaction with the Court by submitting a proposed redacted Order within that period. On the eighth day, without further Order from the Court, the Clerk's Office shall unseal the report unless, prior to that time, a party files a motion to seal and tenders, as an attachment, a proposed redacted report.

## VII. *INSTRUCTIONS FOR SERVICE AND NOTICE OF RIGHT TO OBJECT/APPEAL*

The United States District Clerk shall serve a copy of this Memorandum and Recommendation on each and every party either (1) by certified mail, return receipt requested, or (2) by facsimile if authoriza-

---

**279.** *National Football League Properties,* 808 F.Supp. at 1295 ("Where the defendant's likely harm if the injunction is granted is equal to or greater than any injury threatened by defendant's conduct, injunctive relief is generally denied. *Apple Barrel Prods. Inc. v. Beard,* 730 F.2d 384, 389–90 (5th Cir.1984)").

**280.** Docket no. 20.

**281.** Docket no. 89.

**282.** Docket no. 122.

**283.** Docket no. 122.

**284.** Docket no. 175.

**285.** *See* note 136, above.

**286.** *See* note 137, above.

tion to do so is on file with the Clerk. According to Title 28 U.S.C. § 636(b)(1) and FED. R. CIV. P. 72(b), any party who desires to object to this report must serve and file written objections to the Report and Recommendation within 10 days after being served with a copy unless this time period is modified by the District Court. A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the District Court need not consider frivolous, conclusive or general objections. **Such party shall file the objections with the Clerk of the Court, and serve the objections on all other parties and the Magistrate Judge.** A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party from a de novo determination by the District Court.[287] Additionally, any failure to file written objections to the proposed findings, conclusions and recommendations contained in this Report and Recommendation within 10 days after being served with a copy shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.[288]

April 19, 2001.

---

287. *See Thomas v. Arn,* 474 U.S. 140, 150, 106 S.Ct. 466, 472, 88 L.Ed.2d 435 (1985).

288. *Douglass v. United Serv. Auto. Ass'n.,* 79 F.3d 1415, 1428 (5th Cir.1996).